ADOPTION OF YALE.[1]

No. 05-P-410.

Hampden. October 3, 2005. - December 2, 2005.

Present: GRASSO, DOERFER, & GREEN, JJ.

*Minor,* Adoption. *Parent and Child,* Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent.

At a proceeding to terminate the mother's parental rights, the judge's subsidiary findings of fact, even if supported by the evidence, did not, when taken as a whole, support the judge's ultimate conclusions that the mother was currently unfit to parent the child and that termination of the mother's parental rights was in the best interests of the child, where the primary factor bearing on the determination of unfitness was the mother's prior adjudicated unfitness to parent two other children, and where the basis for the judge's conclusion that adoption would be in the child's best interests was not evident from the record or the judge's findings. [239-243]

PETITION filed in the Hampden County Division of the Juvenile Court Department on April 16, 2002.

The case was heard by *Patricia M. Dunbar,* J.

*Deborah W. Kirchwey* for the mother.

*Susan Riedel,* Assistant Attorney General, for Department of Social Services.

*David A.F. Lewis* for the child.

GREEN, J. At age sixteen, the mother was adjudicated unfit to parent her first child after the child's unexplained injuries, coupled with the mother's involvement in an abusive relationship, led the Department of Social Services (department) to petition for termination of the mother's parental rights. The mother did not contest that action, nor did she contest termination of her parental rights as to a second child, born a little more than a year after entry of the first termination decree.

---

[1]A pseudonym, as are the other children's names in this opinion.

Now twenty-six years old, and having borne a son — her third child — she appeals from a decree of the Juvenile Court adjudicating her unfit to parent her son, terminating her right to consent to his adoption, and declaring that adoption of the child by the mother's sister-in-law would best serve the child's interests. We agree with the mother that the judge's subsidiary findings of fact do not adequately support her ultimate conclusions. We reverse the decree, and remand the matter for further proceedings.

*Background.* The mother was born on December 14, 1978, and is the biological mother of three children: Elizabeth, Samantha, and Yale. Elizabeth was born on March 11, 1995. On August 28, 1995, her maternal grandmother filed a G. L. c. 119, § 51A, report (51A report) with the department alleging abuse or neglect of Elizabeth. In September of 1995, Elizabeth was admitted to the Baystate Medical Center with severe unexplained fractures to her left leg, left elbow, and skull. Neither the mother nor Elizabeth's father was able to explain the cause of her injuries. There was evidence that the relationship between the mother and the father was abusive and marked by frequent violence. There was also evidence that the child was in the care of as many as six or seven different relatives on the weekend of the injury which led to her hospitalization. A care and protection petition was filed on behalf of Elizabeth on September 29, 1995. The mother did not contest that petition; in February, 1998, the mother's parental rights were terminated, and Elizabeth was adopted by a maternal aunt.

The mother's second child, Samantha, was born on May 11, 1999. Two days later, on May 13, 1999, the department filed a care and protection petition on behalf of Samantha, based principally on the mother's continued inability to explain satisfactorily Elizabeth's injuries.[2] On May 18, 1999, Samantha was placed in the home of a maternal aunt. A court investigator found that the mother was well-prepared for Samantha's birth, handled her very well, and had no history of violence or neglect with her. The investigator also reported, however, that the

---

[2]The department also expressed concern about the mother's relationship with Samantha's father (a different individual from the fathers of the other two children), who had been found guilty of assault and battery on the mother.

mother did not maintain contact with the department, did not comply with the department's service plan tasks, and did not visit Samantha after she was removed from the mother's care. The department proceeded to trial on a petition to terminate the mother's parental rights, and the mother did not attend the trial. On February 23, 2001, a decree entered terminating the mother's parental rights as to Samantha.

Yale, the subject of the present petition, was born on April 15, 2002. On April 16, 2002, two 51A reports[3] were filed alleging neglect of Yale by the mother. The reports expressed concern over the mother's past history with the department and alleged that the mother had no stable housing, was using drugs, and did not follow through with prenatal care. The same day, the department filed a care and protection petition, based on the allegations of the anonymous 51A reporters.

During investigation, personnel from Mercy Hospital confirmed that the mother had received poor prenatal care during her pregnancy. However, Yale was born healthy, and weighed six pounds, two ounces. Drug tests for both the mother and Yale, administered shortly after the child's birth, were negative, and the mother claimed not to have used any illegal drugs for the two or three years preceding Yale's birth. Nonetheless, the department proceeded with its care and protection petition, and on May 7, 2002, temporary legal and physical custody of Yale was awarded to the mother's sister-in-law.

The termination trial was scheduled for July 15, 2003, and proceeded on that date without either parent.[4,5] One witness (the department social worker Linda Sibley) testified at trial,

[3]General Laws c. 119, § 51A, reports are admissible only to explain the department's initial involvement with the family. *Adoption of Irene*, 54 Mass. App. Ct. 613, 620 n.8 (2002), and cases cited.

[4]Yale's father died on or about February 17, 2003.

[5]The mother was in court on June 16, 2003, when the trial date was established, but claims she did not hear the date. She claims to have asked her trial counsel to advise her by telephone of the trial date, explaining that she had difficulty receiving mail with reliability. Her trial counsel nonetheless informed the mother of the trial date by letter (consistent with her customary practice), and the mother did not appear at trial. Upon learning that the trial had occurred in her absence, the mother moved, unsuccessfully, for a new trial, claiming (among other things) ineffective assistance of counsel. Our conclusion that the judge's findings do not support the decree of termination

and nine exhibits were introduced in evidence.[6] Sibley testified that there were three service plans developed for the mother after Yale's removal, the primary tasks of which were to participate in therapy, to undergo drug testing, and to secure housing. Sibley stated that the mother did not provide documentation of regular therapy or drug testing, nor did she secure housing. Sibley also testified that her understanding from the guardian was that the mother's visits with the child were not consistent. Sibley observed that Yale seemed happy in the guardian's home.

On the basis of that evidence, the judge concluded that the mother was currently unfit to parent the child and, in a decree entered on July 21, 2003, terminated her parental rights; the mother's timely notice of appeal followed.[7]

*Discussion.* For a court to take the "extreme step" of irrevocably terminating the legal relationship between a parent and child, pursuant to G. L. c. 210, § 3, it must determine "by clear and convincing evidence that the parent is currently unfit to further the child's best interest." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). See *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). "[C]areful factual inspection and specific and detailed findings" by the trial judge are required to "demonstrate that close attention has been given the evidence." *Custody of Eleanor*, 414 Mass. 795, 799 (1993).

A reviewing court will not disturb a trial judge's subsidiary findings unless they are clearly erroneous. *Adoption of Helen*, 429 Mass. 856, 859 (1999). Even if each of the judge's findings is supported by the record, however, it "does not follow . . . that the findings, taken together, [will prove] parental unfitness by clear and convincing evidence." *Custody of Eleanor*, 414 Mass. at 800.

The mother challenges various of the trial judge's findings as

---

obviates the need to address the mother's claim that her trial counsel was ineffective by reason of her failure effectively to communicate the trial date or, alternatively, to request a continuance when the mother did not appear.

[6] Of the nine exhibits, only the court investigator's report contained substantive evidence bearing on the mother's fitness.

[7] While the appeal was pending, the mother moved unsuccessfully for a new trial. See note 5, *supra.*

clearly erroneous.[8] However, we need not undertake consideration of the record support for each of the findings because we conclude that, taken as a whole, the judge's subsidiary findings, even if supported by the evidence, do not support her ultimate conclusions that the mother is currently unfit to parent the child and that termination of her parental rights was in the child's best interests.

In concluding that the mother is currently unfit, the judge made only a handful of findings bearing on the mother's fitness to parent Yale, and the last of those bears positively on her fitness.[9] The findings on the whole are regrettably sparse and, "variously, without requisite detail, [or] specificity" as to the

---

[8]For example, though Sibley testified that participation in therapy and drug testing and the securing of housing were service plan tasks, a review of the relevant written service plans themselves indicates that neither steady employment nor housing were in fact included in the plans. Similarly, the transcript reveals that the judge struck the testimony supporting her finding that "the social worker has seen [Yale] in his placement and feels that he is 'adjusted.'"

[9]Excluding findings that address general background information such as dates of birth, the occurrence and location (but not the quality) of visitation, the temporary placement of the child, and the designation and assignment of the social worker, we recite in full the five findings bearing on fitness:

> "8. On April 16, 2002, a 51A report was filed alleging neglect of [Yale] by mother. The 51A report alleged that mother did not have stable housing and was moving around with friends. The reporter stated that she was using drugs, s[m]oking marijuana, and may [be] using crack and cocaine. A second 51A report was filed alleging the neglect of [Yale] by mother. The reporter expressed concerns of mother's ability to care for her newborn son. The report stated that mother did not follow through with prenatal care, had no provisions for the child, and that mother does not want this baby." [See note 3, *supra*.]

> "10. Personnel from Mercy Hospital confirmed that mother gave birth to [Yale] and stated that he had poor prenatal care. The hospital reported concerns about the growth and development of the baby in utero."

> "15. There have been approximately four service plans developed since [Yale] was taken into custody. The main tasks on these service plans were: therapy, steady employment, drug testing, and to secure housing. Mother was not compliant with the service plan. She did not complete any tasks on her service plan nor were mother's visits consistent."

> "16. Mother never attended parenting classes."

> "21. Mother testified at the temporary custody hearing that things have changed since losing custody of her second child. Mother testified that her family has been involved because they have custody of [Elizabeth]

mother's parenting ability or lack thereof. *Adoption of Iris*, 43 Mass. App. Ct. 95, 101 (1997).

It is clear from the judge's findings that the primary factor bearing on the determination of unfitness was the mother's adjudicated unfitness to parent her first two children. However, though past parental conduct may be relevant to the issue of current parental fitness "where the evidence support[s] the continuing vitality of such conduct," *Adoption of Larry*, 434 Mass. 456, 469 (2001), nothing in the judge's findings draws any connection between the injuries suffered by Elizabeth and the possibility that Yale might be at risk while in the mother's care.[10] Moreover, the judge's findings (supported by the record) suggest that the mother's circumstances were vastly different when her parental rights were terminated as to Elizabeth, compared to her present circumstances. The mother was sixteen years old and involved in an abusive relationship when Elizabeth was born; she is now twenty-six, with family support, and with plans to continue her education.

Despite the precautionary concern expressed at the time of Yale's birth, there is no indication that the mother has a problem with substance abuse; no drugs were evident in the mother or Yale at the time of his birth, and no tests have shown drugs in the mother's system since that time. In any event, even if the mother has engaged in occasional drug use (a possibility that on the present record must rest on no more than speculation), there is absolutely no indication in the record that any drug use has adversely affected her ability or fitness to parent the child. See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 34 (1997). Similarly, the allegation that the mother had "poor prenatal care" is inadequate to support a conclusion of unfitness. Whatever deficiencies might have attended the mother's prenatal care, they appear to have been minor in effect; Yale was born

and [Samantha]. Mother testified that she has family support and that she will be going back to school."

[10]We note that Samantha suffered no injuries while in the mother's care; her removal from the mother's custody upon her birth was prophylactic, as was Yale's.

healthy and with no signs of low birth weight or delayed development.[11]

We attach least significance in these circumstances to the mother's failure to comply with the department's service plans, where certain tasks in those plans do not appear related to any clearly identified deficiencies. Specifically, in the absence of serious concern that the mother is in fact using drugs, we are hard pressed to place great significance, much less dispositive weight, on a requirement routinely imposed by the department that the mother submit to random urine screens. Moreover, as we have observed, see note 8, *supra*, the social worker's testimony appears to have misapprehended or overstated what the service plans actually required.

Our concern with the paucity of the judge's findings is exacerbated by the lack of care evident in her endorsement of the department's plan "that [Yale] be adopted by a maternal relative with whom he has lived for seventeen months." In fact, the department's plan recommended guardianship; the custodial family had expressly eschewed adopting the child.[12] Though the judge expressed the conclusion that adoption by the custodial family would be in the child's best interests, the basis for that conclusion is not evident from either the record or the judge's findings, and of more significance, it appears clear that such an adoption was not sought by the department, presumably because it was not considered to be a live option.

We are not in position to determine whether the mother is currently fit to assume parenting responsibilities for her son. Certainly her failures with her first two children create cause for concern. However, we are unwilling to endorse a conclusion

---

[11]In addition to the findings we have previously recited bearing on the mother's fitness, the judge noted (but did not resolve) conflicting evidence concerning whether the mother considered the possibility of not carrying her pregnancy to term. In the absence of any other evidence or findings tending to suggest that the mother did not want the child, we consider the question irrelevant to the mother's fitness.

[12]The department submitted no written plan in the record. The only evidence concerning a plan was Sibley's testimony "that the current guardian would stay . . . guardian of the child." When the trial judge asked why the department proposed a plan of guardianship for the child, the child's attorney represented to the judge that the guardian and her husband wanted to leave open the possibility of reunification.

of parental unfitness and termination of parental rights that rests solely on neglect of a previous child, in different circumstances and without demonstration that the circumstances or conditions giving rise to the previous unfitness remain in place; to do so would be to make a finding of parental unfitness permanent not only as to the child that is the subject of a particular petition, but as to all future children born to the parent.

The decree terminating the mother's parental rights is vacated, and the matter is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*