NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1473                                            Appeals Court

ADOPTION OF POSY
(and a companion case[1]).

No. 17-P-1473.

Bristol.     September 12, 2018. - February 4, 2019.

Present:  Green, C.J., Milkey, & Singh, JJ.


Adoption, Dispensing with parent's consent.  Minor, Adoption.
    Parent and Child, Adoption, Dispensing with parent's
    consent to adoption.  Practice, Civil, Adoption, Findings
    by judge.


    Petitions filed in the Bristol Division of the Probate and
Family Court Department on September 18, 2014.

    The cases were heard by Katherine A. Field, J.


    Roberta Driscoll for the father.
    Jeremy Bayless for Department of Children and Families.
    Jaime L. Prince for the children.


    SINGH, J.  From his home in Guatemala, the father sought to

obtain custody of his two daughters who were placed in foster

care after the death of their mother in the United States.  The

_____

        [1] Adoption of Beth.  The children's names are pseudonyms.

father could not take immediate custody of the children because he had been deported earlier.[2] After a one-day trial, at which the father was necessarily absent due to his immigration status, a Probate and Family Court judge issued decrees terminating the father's parental rights. In finding the father to be an unfit parent, the judge characterized him as having "abandoned" the children. She also found that he had "a serious issue with criminal activity" and "longstanding issues of domestic violence." As none of these critical findings have adequate support in the record, we vacate the decrees.

Background. The mother and father were both Guatemalan nationals who met in New Bedford; they began their relationship sometime in 2004 but never married. Posy was born in August, 2006, and Beth was born in June, 2009. In April, 2009, two months before Beth's birth, the father was deported, preventing him from acknowledging paternity on Beth's birth certificate.[3] After he was deported, the father maintained telephone contact with the mother (when she had access to a telephone) and the children.

---

[2] Counsel represented that there is a ten-year restriction on the father's reentry to the United States, making him eligible for return by April, 2019.

[3] Although the father has not been adjudicated Beth's legal father, there is no challenge to his paternity.

During the father's absence, the Department of Children and Families (department) became involved with the family. The first contact was in October, 2010, after the mother left the children in the care of a neighbor while she went to the hospital. She suffered from health conditions resulting from alcohol abuse, and her hospital stay became extended. The neighbor could not keep the children for this length of time, which led to a report to the department that the children were being neglected by their mother. Four additional reports of the mother's alleged abuse or neglect of the children followed during the period March, 2011, through February, 2014. Each of the alleged incidents of abuse or neglect filed against the mother occurred during the father's absence. No allegations of abuse or neglect of the children were filed against the father.

In July, 2014, the mother died from complications relating to her alcoholism. Shortly thereafter, a maternal uncle and his girl friend became temporary guardians of the children for a few months.[4] Unable to place the children with another family member or family friend (because of disqualifications based on the immigration status of potential guardians), the department sua sponte took custody of the children in September, 2014, and

---

[4] The children occasionally spoke to the father by telephone while living with the maternal uncle.

placed them with a foster family.[5]  At the same time, a department social worker was assigned to the family.

Sometime after receiving her assignment, the social worker contacted the father in Guatemala.  Because the family was receiving services from the department and the father sought custody of the children, a service plan issued to the father starting on November 11, 2014.[6]  The father indicated that, in the interim, a paternal great uncle was interested in taking care of the children; although the placement was "ruled out" by the department, the paternal great uncle, a paternal great aunt, and a paternal cousin (along with the paternal cousin's three children) began regularly-scheduled visits with the children. On December 9, 2014, less than one month after issuance of the service plan, the goal for the children changed from reunification with their father to permanency through adoption.

---

[5] The children remained in this foster placement at the time of trial.

[6] The father's tasks under the service plan were to (1) maintain monthly contact with the department; (2) provide verification of domestic violence treatment services received in Guatemala; (3) provide current contact information; (4) maintain monthly contact with the children, including letter writing; (5) engage in individual therapy and support the children's need for placement; and (6) "keep the [department] informed of any attempts or process in returning to the" United States.  The social worker's responsibility under the plan, among other things, was to "[m]ake all necessary referrals for the family."

A one-day trial on the petition to dispense with consent to adoption was held on July 14, 2016, at which the father was represented by counsel but not present. On October 3, 2016, the order and decrees issued terminating the father's parental rights. In the accompanying findings, the judge determined that the father had abandoned the children by getting deported. The judge found that there was "clear and convincing evidence of long-standing issues of domestic violence and parental neglect." She concluded that "a serious issue with criminal activity and domestic violence [had] create[d] a continuing risk of harm due to neglect of the children." She approved the department's plan of adoption of the children by the foster parents and declined to order posttermination and postadoption contact. The father appealed.

Discussion. "[T]o take the 'extreme step' of irrevocably terminating the legal relationship between a parent and child," the judge "must determine 'by clear and convincing evidence that the parent is currently unfit to further the child's best interests.'" Adoption of Yale, 65 Mass. App. Ct. 236, 239 (2005), quoting Adoption of Carlos, 413 Mass. 339, 348 (1992). "'[C]areful factual inspection and specific and detailed findings' by the trial judge are required to 'demonstrate that close attention has been given the evidence.'" Adoption of Yale, supra, quoting Custody of Eleanor, 414 Mass. 795, 799

(1993). "A judge's [subsidiary] findings will not be disturbed unless shown to be clearly erroneous. Custody of Eleanor, supra. 'A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Abby, 62 Mass. App. Ct. 816, 823-824 (2005), quoting Custody of Eleanor, 414 Mass. at 799.

We begin by noting the overall problematic nature of the findings of fact and conclusions of law in this case. As acknowledged by all parties, many of the findings of fact are without support in the record.[7] The conclusions of law, which encompass ten single-spaced pages, recite generic propositions of law, without regard to the issues in the case.[8] The ultimate

---

[7] Indeed, the findings most critical of the father recite conversations among identified people occurring on specific dates, yet, inexplicably, there is nothing in the record to support these detailed findings. Additionally, there are other findings that appear not to relate to this case at all (e.g., the father's "documented failure to understand basic concepts of parenting such as appropriate types, amounts and when to feed this child").

[8] Many of the conclusions of law have no relevance to the case, such as those dealing with parental unfitness due to mental health issues and physical abuse of the children. It is unclear which conclusions the judge actually drew in this case. For example, one of the legal propositions recited is that a judge may draw a negative inference from a parent's failure to testify at trial. Here, the judge waived the father's absence at trial due to his immigration status, so any negative inference was unwarranted.

conclusions are untethered to any specific findings of fact and generally assail the father with references to "poor parenting choices," "poor parenting," "poor decision making," and "parental neglect."[9]

Although we are cognizant of the significant burdens placed on trial judges in these cases, the task of setting forth adequate findings and conclusions provides a valuable safeguard. "[A]s every judge knows, to set down in precise words the facts as [s]he finds them is the best way to avoid carelessness in the discharge of [one's] duty:  Often a strong impression that, on the basis of the evidence, the facts are thus-and-so gives way when it comes to expressing that impression on paper." Custody of a Minor (No. 1), 377 Mass. 876, 886 (1979), quoting United States v. Forness, 125 F.2d 928, 942 (2d Cir.), cert. denied sub nom. Salamanca v. United States, 316 U.S. 694 (1942).

Apart from the deficiencies in the judge's findings and conclusions, we are troubled by the swiftness with which the

---

[9] It is unclear what poor parenting choices the father made while he was out-of-country and others had custody of the children.  The judge did find that the father "never took any actions to seek to remove the girls from their alcoholic mother or the neglect that was ongoing for years."  While the statement is true, it is unfair.  The record does not support the premise that the father was aware of the issues with the mother or the extent of them.  Nor does it support the premise that the father was in any position to seek to remove the children from their mother.  We note that the department, which was fully aware of the issues with the mother and legally obligated to seek removal if circumstances warranted, did not do so.

department changed its goal from reunification to adoption. The judge found that the department changed its goal "[d]ue to [the father's] lack of progress with respect to his service plan."[10] In contrast to the judge's finding, the department stated its reason for the goal change at a review hearing: "Given the fact that the mother is deceased and the father, it's impossible for him to come here, the children are United States citizens, our goal has recently been changed to adoption." This explanation, making no mention of the father's alleged lack of progress, indicates a greater concern with the father's immigration status. We are cognizant of the department's charge to establish permanency for the children and that deported parents present a special challenge. That challenge must be met, however, consistent with due process. See Hall, Where Are My Children -- And My Rights? Parental Rights Termination as a Consequence of Deportation, 60 Duke L.J. 1459, 1472 (2011).

We now turn to an examination of the most significant findings underlying the judge's determination of parental unfitness: (1) the father "abandoned" the children, (2) the

---

[10] If indeed this was the reason, the father was given an unreasonably short amount of time -- less than one month -- in which to show progress. See Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002) (department "required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties"); 110 Code Mass. Regs. § 1.02(4)-(9) (2008).

father had "a serious issue with criminal activity," and (3) the father had "longstanding issues of domestic violence."  These critical findings do not have adequate support in the record.  "Stripped of the clearly erroneous findings," the remaining "findings do not rise to the level of establishing the [father]'s current unfitness to parent."  Adoption of Abby, 62 Mass. App. Ct. at 827.

1.  Abandonment.  In applying the factors required to be considered on the issue of parental fitness, see G. L. c. 210, § 3 (c), the judge concluded that the father had abandoned his children by virtue of his deportation.  Yet, "abandoned" is defined in the statute as "being left without any provision for support and without any person responsible to maintain care, custody and control because the whereabouts of the person responsible therefor is unknown and reasonable efforts to locate the person have been unsuccessful" (emphasis added).  Id.  The father's location was well known to the department, and as testified to by the ongoing social worker, he kept in "pretty extensive contact" with the department.  He also, although unsuccessfully, suggested various family members as potential interim caretakers for the children.  Thus, the father did not

abandon the children, as that term is defined in the statute; the finding is clearly erroneous.[11]

2. _Criminal activity_. The judge concluded that the father had "a serious issue with criminal activity." Yet, the father's criminal history report submitted in evidence reflects a single unadjudicated charge for misdemeanor assault and battery.[12] Other than stating that the father was deported because of unspecified "criminal activity," the judge did not make any subsidiary findings concerning any specific criminal activity in which the father had engaged.[13] This general allegation,

---

[11] To the extent that the judge found the father to be unfit due to his unavailability at the time of trial, this was an insufficient ground for termination of parental rights, particularly where the unavailability was temporary. Contrast Adoption of Ilona, 459 Mass. 53, 59-62 (2011) (termination may be appropriate where parental unfitness is likely to continue into indefinite future). Additionally, as the judge noted in her findings, unavailability due to deportation, similar to unavailability due to incarceration, "alone is not a ground for termination of parental rights, and the 'compelled absence of a parent by reason of [deportation] [is] to be taken into account but [does] not conclusively render a parent unfit.'" Adoption of Jacqui, 80 Mass. App. Ct. 713, 718 (2011), quoting Adoption of Nicole, 40 Mass. App. Ct. 259, 261 (1996).

[12] It appears that the father was deported during the course of the proceedings on that charge, resulting in the entry of default.

[13] The judge found that the father was deported "as a result of criminal activity in which he was found to have engaged." However, there is no evidence in the record of any finding by any authority that the father had engaged in any specific criminal activity. Additionally, apart from counsel's representation that there was a ten-year ban from reentry, there is scant evidence in the record concerning the circumstances of

unsupported by any specific incidents, was insufficient to support a conclusion that the father had a serious issue with criminal activity; it was clearly erroneous.

3. Domestic violence.  The judge concluded that the father had "longstanding issues of domestic violence" with the mother. Yet, the record is devoid of police reports documenting any response to domestic violence in the parents' home, or any indication that the mother sought, or obtained, a G. L. c. 209A abuse prevention order for protection against the father. Additionally, the parents each denied that any abuse occurred during their relationship.  The mother reported to the department (during the various investigations relating to the reports of her abuse and neglect of the children) that the father was a "kind and loving man"; in fact, the mother informed the department that she never experienced in her relationship with the father any incidents of violence.  She stated that the father was never jealous, controlling, or possessive, and she denied ever feeling afraid of him.  She said that she became depressed after the father's deportation.  When first contacted

---

the father's deportation.  Whatever brought the father to the attention of the authorities, there is little to suggest that the basis of the deportation was anything other than an immigration violation.  See 8 U.S.C. § 1182(a)(9)(B)(i)(II) (2012) (ten-year ban on reentry for those who remain unlawfully in United States for more than one year).

by the social worker, the father also denied any domestic violence in his relationship with the mother.

The only source for any claim of domestic violence appears to be an isolated comment from the mother's neighbor to a social worker that the father was deported "due to domestic violence." There was no further follow-up inquiry by the department to this comment. There was no indication that the neighbor had any first-hand knowledge of any such domestic violence, and no details of any such incidents were offered. Again, this general allegation, unsupported by any specific incidents, was insufficient to support a conclusion that the father had "longstanding issues of domestic violence."[14] It was clearly erroneous.[15]

---

[14] In an effort to support a single incident of domestic violence, the department points to an investigator's report indicating that the mother was the victim of an assault and battery occurring on August 29, 2008, and the father's criminal history report showing September 2, 2008, as the entry date on a charge of assault and battery. Even if we accept the department's suggestion that this evidence allows the inference that the father was charged with assault and battery on the mother, such an inference is still insufficient. Not only was the charge never adjudicated, there is nothing in the record detailing the event related to the charge.

[15] The judge also criticized the father for failing to engage in treatment for domestic violence issues. Contrary to the judge's conclusions that the father "refused" to "accept" services "offered" or "provided" to him, the record reflects that the department did not make any referrals to specific service providers in his home country. In any event, "[g]iven the lack of any clearly established parental shortcomings [relating to domestic violence] which needed to be rectified in

Conclusion.  Without the clearly erroneous findings, the remaining subsidiary findings here show no "'grievous shortcomings or handicaps [of the father] that put the child[ren]'s welfare much at hazard,' Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. [631], 646 [(1975)], and thus the ultimate finding of unfitness is not properly supported by the [subsidiary] findings."  Adoption of Leland, 65 Mass. App. Ct. 580, 585 (2006).  As a result, the department failed to meet its burden of proving the father's unfitness by clear and convincing evidence.  See Adoption of Imelda, 72 Mass. App. Ct. 354, 363 (2008).  Therefore, we vacate the decrees terminating the father's parental rights, and remand for further proceedings consistent with this opinion.

So ordered.

---

order for the [father] to be able to provide minimally acceptable care," the judge's criticism of the father's failure to participate in domestic violence treatment "adds little to the issue of [his] fitness."  Adoption of Zoltan, 71 Mass. App. Ct. 185, 192-193 (2008).