NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-388                                          Appeals Court

ADOPTION OF WEST (and two companion cases[1]).


No. 19-P-388.

Hampden.      January 13, 2020. - March 27, 2020.

Present:  Green, C.J., Massing, & Lemire, JJ.


Department of Children & Families.  Adoption, Dispensing with
     parent's consent, Visitation rights.  Minor, Adoption,
     Visitation rights.  Parent and Child, Adoption, Dispensing
     with parent's consent to adoption.  Practice, Civil,
     Adoption.



     Petitions filed in the Hampden County Division of the
Juvenile Court Department on August 26, 2013.

     The cases were heard by Rebekah J. Crampton Kamukala, J.


     John P. Dennis for the mother.
     Brian Pariser for Department of Children and Families.
     Kathleen Putney Towers for Brian & another.
     Sherrie Krasner for West.


     MASSING, J.  In this appeal from decrees terminating the

mother's parental rights with respect to the three children, we

_____

     [1] Adoption of Brian and Adoption of Anna.  The children's
names are pseudonyms.

address when and how a parent may assert a claim that the
Department of Children and Families (department) failed to make
reasonable efforts towards family reunification.  The mother's
primary contention on appeal is that the department did not make
sufficient services available to her in Spanish.  Concluding
that the mother never asserted this specific claim during the
course of the proceedings, and that the judge did not abuse her
discretion in determining that the department's efforts were
reasonable and that termination of the mother's parental rights
was in the best interests of the three children, we affirm.

Background.  We summarize the relevant facts as found by
the Juvenile Court judge after seven days of trial, supplemented
by uncontested evidence from the record.  The mother was born in
Puerto Rico, is a native Spanish speaker, and requires an
interpreter to understand English.  She has three children:
West, Brian, and Anna.[2]  At the time of trial, West was eleven
years old, Brian was seven years old, and Anna was four years
old.  All three children have special needs, which at the time
of trial were being addressed by their foster families with the
assistance of counsellors and specialists.

---

[2] The mother met West's father and gave birth to West when
the mother and West's father were teenagers in Puerto Rico.  The
mother met the man who would become Brian and Anna's father in
Puerto Rico and relocated with him to Massachusetts when West
was an infant.  The father of West and the father of Brian and
Anna are not parties to this appeal.

The department first became involved with the mother in 2009 after the mother walked into the local police station and alleged domestic violence by the father of Brian and Anna. The department encountered the mother again in 2011 after receiving a G. L. c. 119, § 51A, report (51A report) alleging neglect of the children. The department closed both cases after investigating and offering services to the mother.

On August 25, 2013, a 51A report was filed alleging neglect of the children at the mother's apartment. When police and social workers arrived they found the mother's friend Caroline Smith (a pseudonym), nine month old Anna, and signs of violence, including dried blood. The mother, West, and Brian were absent; Smith did not know where they were. Earlier that day, the mother had accused the children's babysitter of stealing drugs and money. The mother and the babysitter argued, then the mother hit the babysitter in the face with a pistol. The babysitter left the apartment and was transported by ambulance to Baystate Medical Center (Baystate), where she was treated for an orbital fracture of her eye. The mother was charged with assault and battery by means of a dangerous weapon and released on bail. She was later convicted after a jury trial and received an eighteen-month suspended sentence.

The department took custody of Anna and was informed that West and Brian might be in New York with their maternal

grandfather.  The following day, the department filed a care and protection petition on behalf of all three children.  The next day, the maternal grandmother delivered Brian to the emergency room at Baystate.  Brian had a broken leg and many bruises and required surgery.  Upon release from the hospital, he was placed in a foster home.

The mother appeared for the seventy-two hour temporary custody hearing.  She stated that she was unsure of West's whereabouts.  Twenty minutes after a Juvenile Court judge told the mother that she would be held in custody until West appeared, a family friend delivered him to court.  The mother waived the temporary custody hearing, and all three children remained in the custody of the department.

After the children were removed, the mother engaged in services and complied with the department's plan to work towards family reunification.  In February 2015, the department determined that while the mother had completed only some of her service plan tasks, she was moving in a positive direction.  In May 2015, the department recognized the mother's compliance with the service plan, including her attending individual therapy sessions, and developed a reunification plan for the mother and the children.

In the summer of 2015, the department reunited the mother with all three children.  Within a few months, however, the

mother stopped engaging in services and began neglecting the children. In September 2015, the department removed all three children and placed them in foster homes again after a 51A report was filed alleging that Brian had arrived at school with a burn mark on his back, reporting that West had burned the letter "A" on him with the mother's cigarette lighter while she was outside smoking. The 51A report also stated that the mother had disciplined West with a belt, that she missed school meetings for the children, and that she left the children unsupervised.

The department's goal remained reunification of the children with the mother. The department designed service plans to help the mother reach this goal, but the mother did not fully engage with the services offered. She attended visits with the children twice a month but was often late. One of the service plan tasks required the mother to bring snacks and prepare age-appropriate activities for her visits with the children. When the visits were held in the social worker's office, the mother did not engage with the children but instead let them play with her cell phone or tablet computer. The visits were moved to the Children's Museum, but the mother still had difficulty interacting with the children. Although she completed parenting classes, her primary means of discipline appeared to be corporal punishment.

The department made substantial efforts to provide the mother with mental health care; we discuss these efforts in detail below.  In March 2016, the department changed its goal from reunification to adoption as the mother did not appear to be addressing the issues necessary for reunification.  After a trial that began in February 2017 and concluded in late July, the judge found the mother was currently unfit, was likely to continue to be unfit into the indefinite future to a near certitude, and that it was in the best interests of the children to terminate the parental rights of the mother.  The judge ordered that the children should have at least one visit per year with the mother, so long as the department, or each child's adoptive parent or guardian, agreed it was in the best interests of the child.

Discussion.  The mother's central claim on appeal is that the department failed to make reasonable efforts to reunify her with her children because it failed to provide her with Spanish-speaking service providers.  As discussed below, the mother did not raise this claim at any point in the proceedings when the department could meaningfully address it or the judge could properly evaluate it.  In addition, the mother asserts that we should reverse the judge's decision to terminate her parental rights because it was based on the clearly erroneous finding that she abandoned the children, and that the judge abused her

discretion by declining to order postadoption visits with Brian and Anna.

1. Reasonable efforts. The department is "required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties." Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). Indeed, the department in its regulations "recognizes the special concerns of linguistic and cultural minorities in the Commonwealth," and requires both that its social workers be fluent in a language their clients understand and "that both the services it provides directly and those it provides through providers or contracts are culturally sensitive to the various minority groups in the client population." 110 Code Mass. Regs. § 1.06 (2008).

Judges are required to assess the department's reasonable efforts at various junctures during a case when the department takes or retains custody of children: at emergency custody hearings, at seventy-two hour temporary custody hearings, annually thereafter, and before terminating parental rights. See Care & Protection of Walt, 478 Mass. 212, 219-224 (2017); Adoption of Ilona, 459 Mass. 53, 60 (2011); G. L. c. 119, § 29C. A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous. Adoption of Ilona, supra at 61-62. "However, even where the department

has failed to meet this obligation, a trial judge must still rule in the child's best interest." Id. at 61. See G. L. c. 119, § 29C ("A determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest"). Here, before making the termination decision, the judge specifically found that the department made reasonable efforts to reunite the children with the mother. The judge did not address the department's alleged failure to provide services in Spanish because the mother never raised the issue.

"It is well-established that a parent must raise a claim of inadequate services in a timely manner." Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011). The parent should assert the claim "either when the parenting plan is adopted, when [s]he receives those services, or shortly thereafter." Adoption of Gregory, 434 Mass. 117, 124 (2001). Raising the issue at an early stage in the proceedings allows the department to remedy the inadequate services, which in turn fosters a greater chance of family reunification. A parent cannot raise a claim of inadequate services for the first time on appeal, as the department would not have had the opportunity to address it.

A parent has many avenues available to raise a claim of inadequate services. A parent may pursue her claim by

requesting an administrative fair hearing or rejecting the service plan and filing a grievance. See Adoption of Gregory, 434 Mass. at 124, citing 110 Code Mass. Regs. §§ 6.07, 10.05, 10.06, 10.37, 10.39 (1998).[3] A claim of inadequate services can be raised by a so-called "abuse of discretion" motion. See Adoption of Daisy, 77 Mass. App. Ct. at 781 (mother filed motion claiming that department had abused its discretion by failing to secure specific services). Counsel for a parent may raise issues of inadequate services prior to trial, such as during a pretrial conference. See Adoption of Gregory, supra at 124-125. These methods put the department on notice that its efforts may be inadequate, allow the department an opportunity to remedy any problems, and permit the department to defend its efforts at trial.

Here, the mother contends that she raised her claim of inadequate services in a timely manner because she discussed it with her psychological evaluator and raised it in her proposed findings of fact and conclusions of law submitted after the trial, and that it was a "theme that ran through the life of the case." Adoption of Chad, 94 Mass. App. Ct. 828, 839 n.20

---

[3] In appropriate circumstances, a parent may bring an independent action alleging inadequate services. See Adoption of Gregory, 434 Mass. at 124 (noting that father could have filed action for discrimination under Americans with Disabilities Act).

(2019).  We are not persuaded that the mother put the department or the judge on notice of her current claim of inadequate services.

The mother bases her current reasonable efforts claim on the trial testimony of psychologist Brian Rachmaciej, Ed.D. Throughout its contact with the mother, the department recognized that she had mental health issues and the department periodically assigned Rachmaciej to evaluate her psychological functioning.  The mother and Rachmaciej had a good rapport because he spoke Spanish and was knowledgeable about her cultural background.  She told Rachmaciej that she had difficulties finding Spanish-speaking therapists.  Rachmaciej testified that in general families in western Massachusetts "with very specific linguistic and cultural differences have a much more difficult time obtaining services in the appropriate language or by a clinician with training in their own unique cultural frameworks," and that there is "an extreme lack of psychiatrists," even for "populations that don't require linguistic, specialized or culturally specialized" services.  In 2016, Rachmaciej recommended a partial hospitalization program, weekly therapy, and referral to a psychiatrist for medication. The trial judge found all of the above to be true.

But while the mother confided to Rachmaciej that she was having difficulty finding Spanish-speaking therapists in her

vicinity, there is no evidence in the record that Rachmaciej or the mother conveyed this information to the department. Rachmaciej's role was to assess the mother's psychological functioning and make recommendations for treatment; he did not have a supervisory role in the implementation of her service plan. He testified that on one occasion he took a more active role, advocating to the mother's social worker that she needed the partial hospitalization program, a recommendation with which the mother's regular therapist initially disagreed. Contrary to the mother's current claim, however, Rachmaciej believed that this program had "culturally sensitive linguistically appropriate providers on site." Even though Rachmaciej's testimony touched on the availability of mental health services for Spanish speakers, the mother did not raise the issue in argument at trial.

The mother contends that she raised her claim in her proposed findings of fact and conclusions of law, filed approximately four months after the trial ended. This was too late to raise the issue for the first time. As the trial had already ended, the department had no opportunity to modify its efforts to promote a greater chance of family reunification, or to put on evidence that it had actually made reasonable efforts to address the perceived issue, and the judge did not have an opportunity to evaluate the claim. The mother relies on a

footnote in Adoption of Uday, 91 Mass. App. Ct. 51, 53 n.4 (2017), for the proposition that a reasonable efforts claim can be asserted for the first time in posttrial proposed findings and rulings. Her reliance is misplaced. That footnote quoted a trial judge who had raised the issue of reasonable efforts sua sponte, noting that the father did not address the issue in his proposed findings and rulings and stating that "the issue has not [been] actively litigated or framed from review." Id. To be sure, addressing an issue in proposed findings and rulings is usually a good indication that the issue was raised at trial -- but it is not an acceptable avenue for raising an issue that was never addressed at trial.

In any case, the mother did not raise the issue in her proposed findings and rulings. She did make references to Rachmaciej's testimony, which the trial judge incorporated in her findings. But as to reasonable efforts, the mother's proposed findings focused on the summer of 2015, when the children were returned to her, asserting in general terms that the social worker's efforts on her behalf were not as good as they had been before, that the service plan tasks "were very difficult to fulfill," and that the social worker did not make her a therapy referral until November 2016. The judge rejected this suggestion, finding instead that the mother "worked hard with services in 2015" until her children were returned to her,

but "within a few months of their return, [the m]other stopped meeting with providers for herself and her children."

The record also belies the mother's claim. The department provided the mother with Spanish-language services throughout the case, including providing her with a Spanish-speaking social worker, writing service plans in Spanish and English, having her evaluated by a Spanish-speaking psychologist, and referring the mother to Spanish-speaking therapists. After the children were removed for the second time, the mother's Spanish-speaking social worker made a series of referrals, four in all, to Spanish-speaking therapists. The social worker first referred the mother to West Central Family and Counseling (West Central) in November or December 2015. After the mother failed to respond to requests to set up appointments, West Central closed her case. In late January or early February 2016, the social worker referred her to River Valley Counseling Center (River Valley), but she did not appear for the initial intake appointment. Sometime during the spring in 2016, the social worker referred her to River Valley again, and the mother inconsistently attended therapy there for three or four months. When her therapist at River Valley left to work at the Holyoke Health Center, the mother declined to follow her therapist there because she did not like the facility. In December 2016, the mother was referred to a therapist who could meet with the

mother in her home; she was seeing this therapist at the time of trial. The department more than reasonably accommodated the mother's needs; "heroic or extraordinary measures, however desirable they may at least abstractly be, are not required." Adoption of Lenore, 55 Mass. App. Ct. at 278.

Finally, in a citation to supplemental authority submitted after oral argument, the mother referred us to a footnote in another case, in which we rejected the department's assertion that a reasonable efforts claim had been waived because it was a "theme that ran through the life of the case." Adoption of Chad, 94 Mass. App. Ct. at 839 n.20. In that case, the record raised serious concerns about the mother's mental capacity, but the termination trial did not explore whether available outside support could have assisted her in caring for the special needs of her children. Id. at 839, 842. In the present case, the failure to provide services in Spanish was neither a theme of the case nor supported by the record. The mother has failed to show that the judge's finding of reasonable efforts was clearly erroneous.

2. Finding of unfitness. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020),

quoting Adoption of Ilona, 459 Mass. at 59. "We give substantial deference to the judge's findings of fact and decision, and will reverse only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'" Adoption of Luc, supra, quoting Adoption of Ilona, supra.

The mother argues that the judge erroneously determined she was unfit because she abandoned the children, which resulted in the termination of her parental rights. Under G. L. c. 210, § 3 (c), judges must consider fourteen nonexclusive statutory factors, "to the extent they are relevant, when determining whether the child's best interests require dispensing with the parent's consent to adoption." Adoption of Zoltan, 71 Mass. App. Ct. 185, 195 n.14 (2008). The judge found that the mother "often left her children . . . with unqualified babysitters, or alone for a short time when the oldest child . . . was . . . eight years old." The judge listed this finding under the first statutory factor, "the child has been abandoned." G. L. c. 210, § 3 (c) (i). Although the finding was factually accurate, as a matter of law it does not amount to having "abandoned" the children, which is specifically defined by statute as "being left without any provision for support and without any person responsible to maintain care, custody and control because the whereabouts of the person responsible therefor is unknown and

reasonable efforts to locate the person have been unsuccessful." G. L. c. 210, § 3 (c). See Adoption of Posy, 94 Mass. App. Ct. 748, 753 (2019). This factual finding would have been more aptly categorized as evidence of "neglect," the second statutory factor. See G. L. c. 210, § 3 (c) (ii). Indeed, under the second factor, the judge found, among other things, that the mother "was neglectful of the children leaving them alone at times." The judge's error in classifying the evidence of neglect as evidence of abandonment did not undermine her ultimate conclusion that the mother was an unfit parent and likely to remain so.

3. Postadoption contact. The judge ordered that the children "should have at least one visit per year with their [m]other, . . . as long as it is in the best interests of each child as determined by the [d]epartment . . . while in the custody of the [d]epartment, and to be determined by each child's adoptive parent or guardian when in their custody." The mother argues that this order, which effectively leaves visitation in the discretion of the department and the adoptive parents, contains "nothing but boilerplate language," is contrary to the children's wishes, and is not in their best interests.

The decision to order posttermination or postadoption visits is left to the judge's discretion. See Adoption of John,

53 Mass. App. Ct. 431, 439 (2001). "An order for postadoption visitation is not warranted in the absence of a finding that a significant bond exists between the child and a biological parent and 'that continued contact is currently in the best interests of the child.'" Id., quoting Adoption of Vito, 431 Mass. 550, 563-564 (2000).

The children argue, through counsel, that the order is appropriate and supported by the evidence and the judge's findings, specifically, that West expressed a desire to limit visits to once per year, that Brian feared the mother would hit him and Anna, that the mother came to visits unprepared, that she did not interact appropriately with the children, and that the preadoptive parents were alert to the children's needs. We agree. "When a trial judge decides not to order visitation, . . . [s]he is not required to make extensive findings if [s]he has already made specific and detailed findings regarding the child's best interests and the determination of parental unfitness." Adoption of John, 53 Mass. App. Ct. at 439. Contrast Adoption of Oren, 96 Mass. App. Ct. 842, 849 (2020) (remanding for findings where "despite evidence that visitation would be in the child's best interests," judge gave no explanation for decision not to order postadoption visitation).

Decrees affirmed.