NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-679

ADOPTION OF THELMA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the father was unfit to parent Thelma, and that her best interests would be served by the termination of his parental rights.  The father appeals from the decree terminating his parental rights.  We affirm.

Background.  We set forth the facts found by the judge after trial, supplemented by some facts from the documentary record.  When Thelma was born in July 2019, the father was present and the mother identified him as Thelma's father, but he refused to sign the birth certificate.  Because Thelma's meconium tested positive for cocaine, a G. L. c. 119, § 51A, report was filed with the Department of Children and Families (DCF).

_____

[1] A pseudonym.

On the day after Thelma was born, the father met with the DCF emergency response worker at the hospital. The father told the emergency response worker that he needed to be honest and that he did not feel that he was at a point that he could care for Thelma, if she was his child. The father wanted to have paternity testing done and said that he would be "fully committed" if she was his child.

The father had four other children, who lived with their three respective mothers. He had never been the primary caretaker of any of those children, though he was named on their birth certificates, visited them, and tried to support them and their mothers.

DCF instituted care and protection proceedings. The father attended the temporary custody hearing, G. L. c. 119, § 24, at which he requested that paternity testing be done. When Thelma was six weeks old, she was placed in the care of the foster parents, who became her preadoptive parents. Because of her prenatal substance exposure, Thelma had symptoms that included tremors and tightened muscles, and she received early intervention services.

The judge found that the father's parenting during the first year of Thelma's life was "minimal." The father saw Thelma for five one-hour visits at a DCF office, and failed to appear for two scheduled visits. Then the father stopped

2

visiting Thelma; he testified at trial that it was because he was "going through some things." He no longer had any communication with DCF. The judge found "no evidence to suggest" that DCF had stopped visits during the first year of Thelma's life. In July 2020, DCF changed its goal for Thelma from reunification with the parents to adoption.

For most of the second year of Thelma's life, the father was incarcerated. During the first five months of his incarceration, the father did not contact DCF. In November 2020, his paternity of Thelma was established. In December 2020, the DCF social worker assigned to the case had a telephone conversation with the father. After that, the father had three or four ten-minute video visits with Thelma. During his incarceration he completed a ninety-day program on coping with stress, but did not engage in any other services.

In the late spring of 2021, the father was released from jail. In June 2021, Thelma's mother died. For three months after the father's release from jail, the social worker contacted him by text message because his telephone was not set up to receive voice mail messages. Although the social worker had texted and called him to remind him, the father missed two scheduled in-person visits with Thelma. The father had a single hour-long in-person visit with Thelma in July, one month before trial.

After repeated attempts to schedule a home visit with the father, the social worker finally had one on July 26, 2021. The father had been living for two months in an apartment with his girlfriend and her two sons. The boys slept in the two bedrooms, and the two adults slept in the living room, where he planned that Thelma would also sleep. As of trial, the girlfriend had never met Thelma, nor had she met with the DCF social worker.

At that home visit, the social worker discussed the action plan and the father's tasks listed on it. In the two months since his release from jail, the father had not engaged in any services. As to the task that he attend a parenting class to better understand Thelma's developmental needs, he had attended a two-day class, but it was geared toward helping separated parents to coparent and did not discuss child development. As to the task that he undergo a substance abuse evaluation, the social worker offered to provide a referral for one, but the father said that he believed he already had a referral and would talk to his doctor. As to the task that he submit to drug screens and work on decreasing or stopping his marijuana use, he said that he used marijuana every few days to relax; as of trial, he had not provided DCF with any drug screens. As to the task that he engage in therapy, he told the social worker that he had left a voice mail message for a therapist, who had called

4

him back, but he had not yet returned the call; at trial two weeks later, he testified that he had an appointment scheduled one week after that with a therapist, but he did not remember the therapist's name.

At the time of trial in August 2021, Thelma was two years old. Although he had been present at her birth, the father repeatedly testified to an incorrect date of birth for her. The father was unsure if Thelma was involved with early intervention services. In fact, she had been attending those services weekly since her placement with the preadoptive parents, and had medical conditions including asthma, possible hepatitis B, and a "lazy eye," for which she has been under the care of medical specialists.

Discussion. 1. Unfitness. The father argues that the judge did not have sufficient evidence to find the father unfit to parent Thelma, or that it was in Thelma's best interests to terminate his parental rights. He contends that his unfitness was caused by DCF's failure to provide him with referrals to the services and programs that DCF had recommended for him. We disagree.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is

5

unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021). Because termination of parental rights is an "extreme step, . . . it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotations and citations omitted). Care & Protection of Zeb, 489 Mass. 783, 788 (2022). "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Id., quoting Adoption of Ilona, 459 Mass. 53, 60 (2011).

As set forth above, the judge had before him ample clear and convincing evidence on which to base his finding that the father was unfit to parent Thelma, and that his unfitness as a parent was likely to continue. During the first year of Thelma's life, the father's visits with her were sporadic. He visited with her for five one-hour visits at a DCF office, missed two scheduled visits, and then stopped visiting. During the second year of Thelma's life, the father was incarcerated and made "minimal effort" to make Thelma a priority.

The father argues that DCF failed to assist him in completing the tasks assigned to him, including by providing him with referrals to programs. The father focuses on the month

6

immediately before trial, during which the social worker visited his home, discussed with him the tasks on his action plan, and offered him referrals, which he declined. He contends that because, after that home visit, the social worker was on vacation when the father left her a voice mail message, that showed that his failure to complete the action plan tasks was not his fault. The judge found that DCF did make referrals. Beyond that, the evidence of the father's unfitness dated back to long before that month. The judge found that the father "did next to nothing to come forward as a parent," and his efforts to cooperate with DCF over more than two years were "virtually non-existent."

The father also argues that his failure to complete the action plan tasks was not relevant because they were not tailored to any clearly identified parenting deficiency of his. See Adoption of Yale, 65 Mass. App. Ct. 236, 242 (2005). On the contrary, those tasks -- including that he complete a parenting class dealing with child development, engage in therapy, undergo a substance abuse evaluation, and submit to drug screens -- were tailored to his deficits as a parent.

2. Reasonable efforts. The father also argues that the judge should not have found that DCF made reasonable efforts to restore Thelma to his care. DCF and Thelma both argue that, because the father did not raise this claim at trial, he has

7

waived it.  See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020); Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011).  Moreover, as set forth above, the father's failure for more than two years to make Thelma a priority in his life severely undermines his attempt to cast blame on DCF.  Id. at 782.

3. Paternal half-sibling visitation.  Finally, the father argues that the judge should have ordered visitation between the child and her four paternal half-siblings pursuant to G. L. c. 119, § 26B (b).  DCF argues that because the father did not raise this issue at trial, he waived it.  See Adoption of Gillian, 63 Mass. App. Ct. 398, 408 (2005).  Thelma points out that because there was no evidence at trial of any sibling relationship between her and her paternal half-siblings, there was no basis for the judge to make "a determination of the best interests of the child" on that issue.  G. L. c. 119, § 26B (b).  We agree.

We note that the preadoptive mother testified that Thelma was "very connected to her sisters on her mother's side," with whom the family visited "frequently," particularly because the sisters needed support while grieving the recent loss of their mother.  The judge found that the preadoptive mother "testified, and the court credits, that the adoptive family has and will maintain contact between [Thelma] and her siblings."  If they

8

choose to do so, Thelma and her adoptive family may maintain or develop contact with any of her siblings.  Further, any of the persons permitted to do so by G. L. c. 119, § 26B (b), may file a petition for sibling visitation.[2]  See Care & Protection of Jamison, 467 Mass. 269, 279-280 (2014).

Decree affirmed.

By the Court (Vuono, Grant & Walsh, JJ.[3]),

*Joseph F. Stanton*

Clerk

Entered:  March 21, 2023.

---

[2] Because the Juvenile Court has entered a decree dispensing with the father's consent to adoption of Thelma, he no longer has standing to seek sibling visitation on behalf of Thelma.  See Adoption of Zander, 83 Mass. App. Ct. 363, 367 n.6 (2013).

[3] The panelists are listed in order of seniority.