## Adoption of Whitney.[1]

No. 01-P-814.

Essex. November 8, 2001. - February 19, 2002.

Present: Lenk, Gillerman, & Cohen, JJ.

*Adoption,* Parent's consent, Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Due Process of Law,* Adoption.

A father incarcerated in Maine during proceedings to terminate his parental rights, who had made abundantly clear to the court through counsel before and during trial his desire to participate in the hearing and his objection to its going forward absent such participation, was denied his due process right to a meaningful opportunity effectively to rebut adverse allegations concerning his fitness to parent his child [836-839]; further, since the father was no longer incarcerated, he was to be permitted the opportunity to testify and to introduce other competent and relevant new evidence for the judge to make such additional findings and rulings as might be warranted by the evidence [839].

Petition filed in the Lawrence Division of the Juvenile Court Department on December 15, 1999.

The case was heard by *Jose Sanchez,* J., and a motion for a new trial or, in the alternative, relief from judgment, filed on July 9, 2001, was heard by him.

*George M. Earley* for the father.

*Brian Pariser* for Department of Social Services.

Lenk, J. A decree dispensing with the need to obtain both parents' consent to the adoption, custody, guardianship, or other disposition of their then seven year old daughter, Whitney, was entered in the Juvenile Court on November 17, 2000, after trial that day. The father, who was not present at trial because he was incarcerated in Maine, claims among other things on appeal that he was not afforded a meaningful opportunity to be heard.

[1]A pseudonym.

We agree and remand for further proceedings consistent with this opinion.

1. *Procedural history.* On December 15, 1999, the Department of Social Services (department) filed a care and protection petition on behalf of Whitney pursuant to G. L. c. 119, § 24, and was granted temporary custody of her. Counsel was appointed for the mother and the child at the time, but the docket reflects that counsel was not appointed for the father until some months later. The mother did not attend the seventy-two hour hearing on December 17, 1999, and it appears that the father did not have notice of that hearing. The department caused service to be made on the father by publication in May, 2000. The department became aware of the father's address when he began regular efforts to contact the department and his daughter from the Maine jail. On June 16, 2000, the judge denied for lack of personal jurisdiction the father's motion for writ of habeas corpus and motion to order the State of Maine to transport him to the Commonwealth for hearings.

In late September, 2000, the department changed its goal for Whitney from family reunification to adoption and on October 4, 2000, was permitted to amend its petition to seek the termination of parental rights under G. L. c. 210, § 3. The hearing went forward on the department's petition on November 17, 2000. At that hearing, the mother and the department entered into a joint stipulation for judgment, whereby the mother agreed to surrender her parental rights and be found currently unfit to parent Whitney. The mother has not appealed. Throughout the hearing, the father's counsel objected to proceeding in the father's absence, referring repeatedly to the father's desire and inability to participate, and alerting the judge to the father's anticipated upcoming release from imprisonment in May, 2001. The judge noted the objections, but took no steps to assure that the father would have an opportunity to respond to the evidence presented at trial. The judge instead stated that he drew a negative inference from the father's failure to appear, testify, and participate.

Seventeen exhibits and the testimony of one witness — the department social worker — constituted the trial evidence. The father's counsel objected to the introduction of the documents and cross-examined the witness, but did not offer any evidence

on the father's behalf. On that same day, the judge concluded that both parents were currently unfit to parent Whitney and terminated their parental rights. The father timely appealed.

The judge's findings of fact and rulings of law were issued on May 21, 2001, and the father filed his motion for new trial and relief from judgment, supported by the father's affidavit, on July 9, 2001. The judge conducted a nonevidentiary hearing on July 12, 2001, and on August 9, 2001, denied the motion for reasons stated in a written memorandum. The father appealed, and we granted his motion to consolidate the two appeals.

2. *The judge's findings of fact.* The mother and father, who never married, lived together in Maine where Whitney was born in August of 1993. They lived together until the summer of 1995 when the parents had an argument and separated, Whitney remaining with the mother.[2] The two moved in with the mother's father in Methuen and remained until his death in early 1999. Things then deteriorated as the mother became unemployed and homeless until she and Whitney were taken in by friends.

The department became involved in mid-1999 in response to two G. L. c. 119, § 51A, reports of physical abuse of Whitney by the mother, which were later supported. The mother acknowledged to the department social worker that Whitney had exhibited serious behavioral disturbances since the time she was two years old, and that she spanked Whitney, had unsuccessfully sought psychological help for her, and considered placing Whitney in a foster home because she was concerned about hurting her. The department created a service plan, which the mother did not sign. After another reported instance of physical abuse in late 1999, the department commenced this care and

---

[2]The mother later described the precipitating argument to the court investigator as having begun with her anger at coming home to find that the father had put Whitney to bed with a dirty diaper. At her insistence, and while upset, he changed the diaper and "banged" Whitney while doing so, the one and only time he had been physically abusive to the child. He then kicked the mother, punched holes in the wall, and left. The judge found that, while in his letters to the social worker the father described this incident differently, it was clear there had been domestic violence in the home. In the letters, the father described the precipitating argument as one which began with his coming home to find the mother on drugs while caring for their daughter. He got angry, punched the wall, and left; he denies any physically abusive contact with the mother or the child.

protection petition and obtained custody of Whitney, and created additional service plans for the mother with which she only partially complied. The department changed its goal for Whitney from reunification to adoption at the end of September, 2000, in view of the insufficient progress the mother had made and the father's inability to care for Whitney due to his incarceration.

Whitney, at the time of trial, had been in two foster homes; she was removed from the first home due to temper tantrums and physically aggressive behavior and, while somewhat improved in her second placement, continued to exhibit behavior problems. She has been diagnosed with "reactive attachment disorder" and "parent child relational issues." An adoptive family had not been identified for Whitney at the time of trial.[3]

As to the father, the judge found that the father had made himself known to the department on May 22, 2000, stating in a series of communications the following: he is Whitney's biological father; he loves and is interested in Whitney; he wants her to visit and write to him in prison; he is innocent of the crime for which he was incarcerated (sexual assault of a twenty-five year old woman); he wants to be a full-time father for Whitney after his May, 2001, release and requests that members of his family be considered for interim guardianship; and he is making efforts to obtain housing and social security for Whitney and himself, as well as to participate in family counseling and a parenting program while incarcerated.

The judge relied on the social worker's testimony to find that the father had attempted, through her, to send a card and several letters to Whitney, which she did not forward because she thought them inappropriate. The social worker indicated that one identified member of the father's family was unsuitable as a potential placement because of "CORI issues" and that she had not had a reply to information she had sent to two other family members. The judge found that the social worker took no steps to contact the father and did not bring Whitney to visit him. The judge also found that the father had not had any contact with Whitney since 1997, when he was incarcerated in Maine

---

[3]This remained the case as recently as the date of appellate oral argument.

for gross sexual assault. The judge noted that no evidence had been introduced as to the father's payment of child support or the amount of contact he had had with Whitney prior to his incarceration. The judge concluded that, given the nature of the father's criminal offense, the inappropriate card he attempted to send Whitney while incarcerated, the 1995 episode of domestic violence, his lack of significant involvement with Whitney prior to his incarceration and lack of direct contact with her while incarcerated, as well as Whitney's severe behavioral problems, the father lacks the capacity to parent her.

3. *Discussion.* The trial took place roughly two weeks before the issuance of *Adoption of Edmund*, 50 Mass. App. Ct. 526 (2000), where we held that, in a proceeding to terminate parental rights, due process requires that a parent wishing to do so — including a parent who is incarcerated — must have the opportunity effectively to rebut adverse allegations concerning parental fitness. *Id.* at 529. While an incarcerated parent who makes known to the court his desire to participate does not have an absolute right to be present at such hearing, particularly if represented by counsel, we observed that trial judges, exercising flexibility consistent with the facts of each case, should determine among currently available options how best to assure that a parent has a meaningful opportunity to rebut the evidence presented at trial. *Id.* at 529-530. In some cases, that may include the parent's presence at trial. *Id.* at 529. In others, it may best occur through video or telephone conferencing during trial; in yet others, through appropriate documentary submissions, deposition testimony, or other reasonable means. The responsibility for devising a mechanism for meaningful participation, once requested, rests with the judge. *Id.* at 530.

The judge was understandably not clairvoyant at the time of trial and, consequently, made no such effort to devise a means by which the father could meaningfully participate. In his subsequent findings of fact and rulings of law, issued months after *Adoption of Edmund, supra* at 529-531, the judge acknowledged that it was error for him previously to have drawn a negative inference from the father's failure to appear and testify. While vacating that finding, the judge nonetheless made the previously summarized adverse findings as to father's fit-

ness to parent Whitney based on the documents in evidence and the testimony of the department social worker.

The father's posttrial motion for new trial or relief from judgment, see *Adoption of Reid*, 39 Mass. App. Ct. 338, 340 (1995), and cases cited, expressly relies upon *Adoption of Edmund, supra*, in seeking a new or reopened hearing, and was supported by the father's affidavit indicating certain adverse fact findings made by the judge that the father sought an opportunity to rebut by his own testimony and perhaps by other documents and the testimony of other witnesses.[4] In his denial of the motion, the judge thought *Adoption of Edmund, supra*, materially distinguishable because the father's counsel there had made more timely and persistent requests for leave to appear through various mechanisms than had been the case here. The judge also thought a new trial or reopened hearing would in any event be unavailing since the proffered evidence would not likely alter certain key facts the judge had already found.

As to the former point, we think the judge read *Adoption of Edmund, supra*, much too narrowly; it is not limited to protecting the due process rights of only those incarcerated parents who make exhaustive efforts to participate. The father here had made abundantly clear to the court through counsel before and during trial his desire to participate in the hearing and his objection to its proceeding absent such participation; no more was required of him.[5] As to the latter point, that the father would likely not succeed before the judge at a new hearing, we

---

[4] The father asserted in his affidavit that it was not until April of 2000 that he first learned that Whitney was no longer with her mother but in department custody, that he had since made numerous efforts to communicate with the social worker and Whitney to no avail, and that he had wanted to participate in the trial and now wants to testify regarding his present ability to parent Whitney. He wants, among other things, to rebut the characterization of the 1995 incident as involving domestic violence on his part and the characterization of the card he sent to Whitney, to explain the quality and quantity of pre-incarceration contact he had with Whitney, the support he provided, and the parenting skills he has acquired. He wants also to provide information as to his current circumstances, i.e., employment, housing, transportation, health, the support of family, and like matters.

[5] The suggestion that the father failed to make sufficiently persistent efforts seems especially harsh when consideration is given his repeated efforts to contact the department after learning of the proceedings to terminate his parental rights and the apparent departmental indifference to those efforts. The

consider it reflective of the judge's effort to address the rule 60(b)(6) aspect of the motion, rather than as indicative of any unwillingness on his part to consider additional evidence on its merits. See *Adoption of Hugh*, 35 Mass. App. Ct. 346, 353 (1993). The father's affidavit, however, was plainly not offered as a substitute for his participation at trial, but only to support his quest for an opportunity to testify in light of *Adoption of Edmund*, 50 Mass. App. Ct. at 529-531, and in view of his release from incarceration. Cf. *Adoption of Hugh*, *supra* at 351. The judge's prior findings as to the father's unfitness had, of necessity, been derived from documentary evidence and social worker testimony. Findings made as to the parental relationship, what caused their separation in 1995 when Whitney was two years old, the nature of the 1995 incident which the judge characterized as domestic violence, and the father's contacts with, and financial support of, Whitney after the parties' separation in 1995, were all based upon one-sided communications the mother had had with, among others, the court investigator and the social worker. The mother did not testify at trial, and the individuals with whom she had spoken (and whose communications with the mother were in evidence at trial) had not interviewed the father. It is inconceivable that the father's testimony on these matters, if believed, would have no effect on the judge's findings.

We think without merit the department's contention that the father received all the process due him because his counsel participated at trial, because letters he had written from prison were in evidence, and because his posttrial affidavit was considered by the trial judge. Taken together and in context, these simply do not constitute, in the circumstances, the requisite meaningful opportunity for the father to rebut the adverse evidence offered as to his fitness to parent Whitney. Compare *Adoption of Hugh*, *supra*. That the father's release from prison was imminent at the time of trial, and the concomitant impact his release would have on his potential ability to parent Whit-

social worker never sent the father a service plan, inquired of his correctional status from Maine officials, contacted him, and certainly never offered him services. Moreover, a careful reading of *Adoption of Edmund*, *supra* at 527 & n.3, indicates that the attorney's persistent efforts occurred with court authorization.

ney, made all the more problematic the judge's failure to accommodate the father's wish to participate in the proceedings.

Having determined that the father's due process rights were not adequately protected prior to the adverse adjudication of his parental rights, we must determine the remedial additional process he is now due. Our decision in *Adoption of Edmund, supra,* did not limit to posttrial affidavits the remedy for incarcerated parents who were precluded from having meaningful participation at trial. Reflecting the contingent nature of due process, we provided there a remedy that was "[m]indful both of the father's interest, and the governmental interest in an expeditious determination of a child's familial status." 50 Mass. App. Ct. at 531. The remedy devised in *Adoption of Edmund, supra,* was to vacate the decree as to the father and remand for further proceedings in which the father could present new evidence by affidavit to which the department could respond; the judge would thereafter make appropriate additional findings.

Unlike the father in *Adoption of Edmund, supra* at 528-529, who remained incarcerated out of State at all relevant times, the father here is no longer incarcerated. This is significant in at least two respects. First, it removes from consideration the father's physical unavailability due to incarceration when determining his current fitness to parent. Second, he is apparently available to testify in Massachusetts and no alternative means thus need be devised. This being so, we think the most efficient and expeditious way forward is simply to permit the father the opportunity forthwith both to testify and to introduce other competent and relevant new evidence, through the testimony of other witnesses or otherwise. The department may, in the judge's discretion, be given the opportunity to rebut such evidence by the introduction of competent and relevant evidence as well. The judge shall thereafter make such additional findings and rulings as may be warranted by the evidence.

The decree dated November 17, 2000, as to the father, is vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*