ADOPTION OF JACQUI.[1]

No. 11-P-226.

Hampden. June 6, 2011. - October 28, 2011.

Present: CYPHER, McHUGH, & KAFKER, JJ.

*Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Minor,* Adoption, Visitation rights. *Constitutional Law,* Parent and child. *Due Process of Law,* Adoption.

The father of a child who was the subject of a petition to dispense with parental consent to adoption was denied his due process right to a meaningful opportunity to be heard, where the trial on the petition was conducted while the father was incarcerated and unaware that the trial was taking place, where the judge was alerted to the father's possible incarceration multiple times at trial and at a posttrial hearing on a motion for visitation, and where the father's representation at the trial and hearing was cursory. [716-719]

PETITION filed in the Hampden County Division of the Juvenile Court Department on September 22, 2009.

The case was heard by *Patricia M. Dunbar,* J., and a motion for a new trial, filed on September 1, 2010, was also heard by her.

*Gary M. O'Brien* for the father.

*Maryanne Reynolds,* Assistant Attorney General, for Department of Children and Families.

*Kerry A. Bagnall* for the child.

CYPHER, J. The father of Jacqui, born in June, 2008, appeals from a decree of the Juvenile Court dispensing with parental consent to the adoption of Jacqui pursuant to G. L. c. 119, § 26, in accordance with G. L. c. 210, § 3.[2] He also appeals from the judge's denial of his motion for a new trial, which is consolidated

---

[1] A pseudonym.

[2] The mother is not a party to this appeal.

with the underlying appeal. The father argues that his due process rights were violated because the trial was conducted while he was incarcerated and unaware that it was taking place, even though the judge was alerted to the father's possible incarceration multiple times during the trial. We agree, reverse the denial of the motion for a new trial, vacate the decree, and remand for further proceedings.

1. *Procedural background.* On September 22, 2009, the Department of Children and Families (DCF) filed a care and protection petition pursuant to G. L. c. 119, § 24, on behalf of Jacqui. This followed a G. L. c. 119, § 51A, report alleging neglect of Jacqui as a result of the mother's drug use and homelessness causing the mother and child to live in a car. The judge held a temporary custody hearing on October 2, 2009, which was deemed waived by the parents, who did not attend that hearing. Temporary custody of Jacqui was awarded to DCF. The trial on the merits of DCF's care and protection petition was held on May 4, 2010. Again, neither parent was present, although their attorneys were in attendance.

At the commencement of the trial, the attorney for DCF stated that "a couple of weeks ago, [an individual] from probation . . . must have run a CORI on the father and discovered that he was incarcerated."[3] The attorney then indicated that she had filed a motion for the release of the father's and mother's CORI which would "be able to confirm whether or not [the father] is incarcerated." She continued, "[I]f he is, we'll figure out how to proceed from there." The judge allowed the motions. The judge then asked the father's attorney if she had any contact with the father. She responded, "Not recently, Your Honor, although I couldn't say if he was incarcerated." The judge then commented, "He forgot to call you before he had to go," to which his attorney responded, "Yeah." The father's attorney also indicated that she last saw her client in November, 2009.

After further discussion of preliminary matters, the attorney for the father asked the judge to clarify if the trial was for both parents, inquiring, "Your Honor, we are not proceeding only as to mother at this point. Is that correct?" The judge responded,

---

[3] "CORI" refers to criminal offender record information.

"Yes, that's right." A little later, the judge asked again, "And father is — Is father incarcerated?" A "voice" responded, "I don't have that information, Your Honor." The attorney for DCF then indicated that the information regarding the father's purported incarceration came from the father's mother and not from the probation department. The DCF attorney also stated that as recently as April 9 (three and one-half weeks previously), "the worker checked and confirmed that [the father] was not incarcerated." The judge then said that the trial was "as to both parents."

Under direct examination, the social worker assigned to the case testified that the last time she saw the father was the first week in November when she met with him in the context of a visit with Jacqui to discuss the service plan of DCF.[4] Subsequent to that encounter, the social worker attempted to contact the father by telephone, by mail, and in person when she tried to visit him at his last known address, but she was unsuccessful in locating him. She then went on to testify that while talking to the father's mother on April 27, she learned that he had been incarcerated.

Despite the numerous intimations before and during the trial that the father might be incarcerated, the trial continued without stopping to discover if he was indeed incarcerated. The father's attorney did not object to the trial continuing in his absence, nor did she insist on discovering if her client was incarcerated. Following the hearing, the judge found that both parents were unfit by clear and convincing evidence and that it was in Jacqui's best interests to terminate the mother's and father's parental rights.[5]

The father filed a posttrial motion for visitation, and a hearing was held on June 16, 2010. At that hearing, the father's incarceration at the time of the May 4 trial was confirmed by his attorney.

---

[4]At the time of her discussion with the father, the goal of DCF was reunification of the family. While the social worker indicated that she told the father about the importance of complying with DCF's service plan, she also testified that she did not tell him that DCF might change the goal to adoption if he failed to comply with the plan. DCF's goal for Jacqui was changed to adoption on April 16, 2010.

[5]DCF's adoption plan was recruitment of a family that would be "sensitive to [Jacqui's] emotional needs."

The father, who had been brought to court by a habeas petition, stated, "I didn't even know that there was a trial." The judge responded by asking the father's attorney why she did not notify her client of the trial date, to which she replied that she had sent him a notice to his last known address. The motion for visitation was denied.

The father filed a motion for a new trial that was also denied by the judge after a hearing on September 15, 2010. In support of his motion, the father stated in an affidavit that he was incarcerated as of April 12, 2010, and was, in fact, incarcerated on May 4, 2010, the day of the trial. At that hearing, where the father again was not present, the judge stated to the father's attorney that the father "has an obligation to keep in touch with you and his social workers and so on and so forth," and asked if the father knew about the trial date. His attorney again responded that she sent "correspondence to the last known address so I cannot say if he knew about it." The judge then inquired if the father had the attorney's address, to which she replied, "Yes . . . as far as I know." Somewhat remarkably, given the nature of her client's request for a new trial, his attorney stated, "I didn't check [his] file. I may have forgot to habe him." The judge responded, "All right. So he could have been habed today. He wasn't habed today." The father's motion for a new trial was denied.

2. *Discussion.* The father claims that he was denied his Fourteenth Amendment to the United States Constitution right to due process because the trial terminating his parental rights took place despite the fact that he lacked notice, that he was incarcerated at the time of the trial, and that his incarceration was mentioned multiple times in the course of the trial.

"Parents have a fundamental liberty interest in maintaining custody of their children, which is protected by the due process clause of the Fourteenth Amendment to the United States Constitution." *Care & Protection of Erin,* 443 Mass. 567, 570 (2005). "State action terminating a parent-child relationship must comport with due process, including notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Adoption of Zev,* 73 Mass. App. Ct. 905, 905 (2009). This court has held that an incarcerated parent must have a

"meaningful opportunity to be heard" when his parental rights are in danger of being terminated. See *Adoption of Edmund,* 50 Mass. App. Ct. 526, 526-527 (2000) (father incarcerated out-of-State denied "meaningful opportunity to be heard" when telephone equipment enabling father to participate in trial did not work correctly and judge refused to grant father continuance); *Adoption of Whitney,* 53 Mass. App. Ct. 832, 832, 838 (2002) (incarcerated father denied "meaningful opportunity to be heard" when judge relied "on one-sided" adverse testimony to terminate father's parental rights despite father's attorney's objection to proceeding in father's absence). Cf. *Adoption of Rory, ante* 454, 459 (2011).

A parent cannot exercise a "meaningful opportunity to be heard," however, if he has not first received notice that he is in danger of having his parental rights terminated. Failure to give notice of a pending proceeding to terminate parental rights violates "the most rudimentary demands of due process of law." *Armstrong* v. *Manzo,* 380 U.S. 545, 550 (1965). Compare *Adoption of Hugh,* 35 Mass. App. Ct. 346, 350 (1993) (notice of proceeding to terminate parental rights is inadequate when given by publication where parent cannot read and more diligent effort to locate parent would have found him residing in community where he lived most of his life).

DCF's main argument in this case is that the father was not present at the trial as "the result of his own actions and inaction," contending that it was the father's duty to inform his attorney that he was incarcerated and that an incarcerated parent must make his desire to participate in a parental termination hearing "abundantly clear." Contrast *Adoption of Whitney,* 53 Mass. App. Ct. at 837. However, this argument misses the mark, because the father states that he did not receive notice of the upcoming trial due to his being incarcerated. Lacking notice, the father patently could not have made it clear that he wished to participate in the hearing.

Counsel for Jacqui argues that the father should have instituted "inquiry" into future proceedings, including the possibility that his parental rights would be terminated. However, because the social worker did not inform him that DCF might change its goal from reunification to adoption, the father could not have

foreseen the need to make a "reasonable diligent inquiry" about a future hypothetical hearing that could result in the loss of his parental rights. Contrast *Adoption of Simone*, 427 Mass. 34, 40 (1998). At the same time, the father did have some responsibility to keep his attorney informed of any changes in his address in the ongoing care and protection case. Had he done so, he may well have learned of the change in goal.

DCF suggests that the father's due process rights were protected since he was represented by his attorney at trial and in posttrial hearings. It is plain, however, that the father's representation was cursory. Even when it became clear during the course of the trial that her client might be incarcerated, the father's attorney did not object to the continuation of the trial. In response to questions from the judge asking if her client had received notice, she repeatedly responded that she had sent the notice to his last known address.

"[A]n incarcerated parent does not have an absolute right to attend a hearing that could result in a termination of parental rights, particularly if the parent is represented at trial by a lawyer." *Adoption of Edmund*, 50 Mass. App. Ct. at 529. However, where, as here, there was uncertainty about the father's incarceration, and his attorney had been out of contact with him, the father could not have been adequately represented. In these circumstances, we think the judge had a responsibility to "devis[e] a mechanism for meaningful participation" by the father. *Adoption of Whitney*, 53 Mass. App. Ct. at 836. Compare *Adoption of Rory, supra* at 458-459.

There is little doubt that proceeding with trial in these circumstances was improper, and it appears that the judge weighed the father's absence heavily, drawing a negative inference from the father's failure to appear. Incarceration alone is not a ground for termination of parental rights, and the "compelled absence of a parent by reason of incarceration [is] to be taken into account but [does] not conclusively render a parent unfit." *Adoption of Nicole*, 40 Mass. App. Ct. 259, 261 (1996).

The judge's findings concerning the father principally indicate that he was only minimally engaged with DCF, having no contact with DCF since November, 2009; failed to cooperate in completing service plan tasks; and visited Jacqui only twice. There are

no specific findings that the father failed in particular parental duties. It is especially significant that in July, 2009, the mother voluntarily agreed to Jacqui's placement in foster care, a decision made without any involvement by the father. Ultimately, the judge's findings appear to be based on evidence offered by DCF.

Posttrial, the father submitted a motion for visitation, which was denied on the ground that his parental rights had been terminated and that he failed to submit evidence of a bond with Jacqui at trial. The hearing on the father's motion for a new trial consisted only of a few preliminary questions and, more significantly, the father's attorney "may have forgot to habe" the father. The hearing could not seriously be considered a "meaningful opportunity to be heard."

Because it is clear that the father did not receive proper notice of the trial to terminate his parental rights, and was not able to participate in the trial due to his incarceration, he was denied a meaningful opportunity to rebut the adverse evidence against him, despite having an attorney who participated at his trial. The father was denied his due process rights.

*Conclusion.* We reverse the denial of the father's motion for a new trial. We vacate the decree and remand for further proceedings in accordance with this opinion.[6]

*So ordered.*

---

[6]Because we conclude that the due process violations require a new trial, we need not reach the remaining claims raised on appeal including the judge's decision that the father was unfit to parent Jacqui or that it was error to deny the father posttrial visitation with his daughter. The father may seek visitation in the trial court. See G. L. c. 119, § 21.