NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-166                                            Appeals Court

ADOPTION OF ILIANA
(and a companion case[1]).

No. 19-P-166.

Worcester.     July 8, 2019. - November 6, 2019.

Present:  Green, C.J., Maldonado, & Hand, JJ.


Adoption, Dispensing with parent's consent.  Parent and Child,
     Dispensing with parent's consent to adoption. Minor,
     Adoption.  Child Abuse.  Evidence, Hearsay, Unavailable
     witness, Expert opinion.  Practice, Civil, Adoption,
     Hearsay, Bias of judge.  Witness, Child, Competency,
     Unavailability, Expert.




     Petitions filed in the Worcester County Division of the
Juvenile Court Department on May 13, 2013.

     The cases were heard by Carol A. Erskine, J.


     Andrew D. Hoffman for the mother.
     Maria B. Hickey for Department of Children and Families.
     Shelli C. Hamer for the children.


     HAND, J.  The mother appeals from decrees issued by a judge

of the Juvenile Court finding her unfit to parent her two

---

[1] Adoption of Susan.  The children's names are pseudonyms.

daughters and terminating her parental rights. She focuses her appeal on the pretrial hearing, held in accordance with G. L. c. 233, § 82 (§ 82 hearing), regarding the admissibility of the children's out-of-court statements describing allegations of sexual abuse. The mother claims that the trial judge, who also conducted the § 82 hearing, (1) was not impartial, (2) misinterpreted § 82 in excluding the mother's experts from testifying at that pretrial hearing, and (3) erred in admitting at trial the children's hearsay statements (divulged at the § 82 hearing) regarding matters other than sexual abuse. Although we decline the mother's invitation to read into the statute a prohibition against the same judge presiding over both a § 82 hearing and the trial to which it pertains, and reject her argument that the trial judge was biased in this case, we conclude that the judge erred in limiting the mother's ability to introduce expert testimony at the § 82 hearing to expert witnesses who had treated the children. As the error was not harmless and the hearsay evidence admitted through the § 82 process was essential to the judge's ultimate termination of the mother's parental rights, we are constrained to vacate the decrees.

1. Background. a. The investigations. We summarize the relevant facts from the judge's comprehensive and detailed findings, reserving certain facts for later discussion. On May

13, 2013, the Department of Children and Families (department) filed an emergency petition seeking care and protection of Iliana (born in 2005) and Susan (born in 2011), based on allegations that Iliana had been physically abused and neglected by the mother and Susan's biological father (father).[2]  The department was granted temporary custody of both children; the children were placed in foster care.[3]

b.  The children.  i.  Iliana.  In September 2013, while the children were in foster care, a G. L. c. 119, § 51A, report (51A report) was filed with the department that alleged neglect and sexual abuse of Iliana;[4] both the mother and the father "vehemently denied" the allegations.  The department doubted the

---

[2] Susan's biological father has no parental rights as to Iliana.  On October 25, 2017, during the § 82 hearing, he stipulated to a finding of unfitness and the termination of his parental rights as to Susan, and he is not part of this appeal.  In addition, the mother informed the department of the name of Iliana's biological father, but his name did not appear on Iliana's birth certificate.  Iliana's putative father contacted the department by letter in June 2014, but did not participate in the proceedings, and any parental rights he may have had as to Iliana were terminated after trial on the merits.  He also is not part of this appeal.

Our use of "father" in this opinion refers to Susan's biological father only.

[3] In November 2013, Susan was reunited with her parents; however, one year later, the department again removed Susan from the parents after Iliana alleged sexual abuse by the father.

[4] The father was not at that time alleged to have perpetrated the sexual abuse.

allegations, and apparently credited the mother when she said that Iliana made up stories, which the mother attributed to Iliana's exposure to explicit Spanish-language soap operas (telenovelas). After a department investigation, the allegations were unsupported.

In November 2013, eight year old Iliana was referred to an individual therapist; she met with the therapist in her foster home once or twice each week until December 2014. Iliana gradually made descriptive disclosures of sexual abuse to the therapist.[5]

In February 2014, as a result of Iliana's disclosures to her therapist, Dr. Heather Forkey conducted a physical examination to determine whether Iliana had been the victim of sexual abuse. Dr. Forkey opined, and the judge found credible, that Iliana's genital examination revealed "evidence of repeated and/or severe penetrating trauma" to Iliana's hymen consistent with sexual abuse, "possibl[y] [by] multiple people." After

---

[5] Iliana first disclosed to her therapist that she was on occasion sexually assaulted and raped by the father and other men, including by a boarder who lived with Iliana and her family. She stated that the father allowed her to go off with other men and that she was taken to a "brown house" where the men touched her chest and vaginal area, and that one man kept her underwear. She also disclosed that when she was living in Ecuador (from September 2011 to February 2013), her grandmother would send her out, wearing a skirt, with an older man who used different objects to penetrate her, which included putting his fingers inside her. During therapy sessions, Iliana drew pictures of the men who sexually abused her.

this examination, another 51A report was filed alleging neglect by the mother and father and sexual abuse by an unknown perpetrator.

As trust developed between Iliana and her therapist, Iliana revealed additional details about the sexual abuse she had experienced, including the fact that the father was one of her abusers, and that his abuse had begun when Iliana was only four years old. Iliana disclosed to her therapist that the father "touched [her] everyday and it hurt," and that on at least one occasion, the father was "inside of [her]," "having sex with [her]." Shortly after making detailed disclosures to the therapist about the father's sexual abuse, Iliana had to be hospitalized. Around this time, Iliana made similar disclosures of sexual abuse to her foster mother. Ultimately, the department concluded that Iliana had, in fact, been sexually abused by the father.

ii. Susan. Susan also made spontaneous statements of sexual abuse by the father. Two 51A reports were filed by two different mandated reporters: in December 2015, four year old Susan disclosed to her foster mother that she showered together with the mother and the father;[6] in March 2016, she disclosed to her foster father that the father had touched her "soft[ly]"

---

[6] As a mandated reporter, the foster mother filed with the department a 51A report alleging sexual abuse of Susan.

"down there" while pointing to her vagina.[7,8] Dr. Forkey conducted three separate forensic examinations of Susan in February and September 2014, and April 2016. Dr. Forkey did not observe any scarring from penetration trauma, but did not rule out occurrences of sexual abuse or penetration. Melanie Milde, a licensed social worker and independent child trauma evaluator, met with Susan for four one-hour sessions -- twice in December 2016 and twice in January 2017. During those sessions, in conversation accompanied by Susan's drawings and independent doll play, Susan revealed to Milde that she got "hit a lot" by the mother and the father and that she was sometimes afraid of them.[9] In their fourth session, Susan disclosed to Milde that the father went into the shower with her with no clothes on and that "[she did]n't look at his privates, but he look[ed] at [hers]."

c. Section 82 hearing. In September 2017, anticipating a hearing on the merits of the care and protection petition, the department moved to admit the children's out-of-court statements

---

[7] As a mandated reporter, the foster father filed a 51A report with the department, alleging sexual abuse of Susan.

[8] Susan did not disclose any sexual abuse allegations during her Sexual Assault Intervention Network interview.

[9] Milde stated that her technique in evaluating children was to be quiet and not to ask too many questions, and to let the child talk freely.

regarding sexual abuse by the father.  See G. L. c. 233, § 82.[10]
The mother vigorously opposed the motion.[11]  On seven
nonconsecutive days between October 16 and November 1, 2017, the
judge held the evidentiary hearing required under § 82, to
determine the admissibility of the children's hearsay
statements.[12]

At the outset of the hearing, the judge specifically stated
that the focus of the hearing was to obtain "testimony regarding

---

[10] As we discuss in more detail infra, G. L. c. 233, § 82, creates an exception to the hearsay rule for out-of-court statements made by a child under ten years of age describing sexual contact with the child, provided the proponent of the hearsay establishes that the child is "unavailab[le]" and the statements are reliable.

[11] Although the mother initially rejected Iliana's reports of being sexually abused, once informed of Dr. Forkey's findings, the mother indicated that she believed that Iliana had been raped.  The mother, however, refused to believe that the father or their boarder were the perpetrators of Iliana's abuse (see note 5, supra); in fact, as the judge found, "there were endless obsessive efforts by [the mother] to prove [Iliana] was lying when she reported" that the father and the boarder had raped her.

[12] Prior to the start of the § 82 hearing, in accordance with Adoption of Olivette, 79 Mass. App. Ct. 141, 154-155 (2011), the judge conducted an individual voir dire with Iliana in which the judge found Iliana to be highly intelligent, articulate, and organized in her responses, and concluded that she demonstrated a clear understanding of the need to tell the truth.  The judge did not conduct an individual voir dire with Susan because she was "easily distracted, and fidgety"; however, the judge observed the two children together and how Susan interacted with Iliana.  All counsel and the mother (the father was not present) listened to the recording of the voir dire prior to the start of the § 82 hearing.

[the children's] availability and reliability."  She also instructed the parties that "consistent with [G. L. c. 233, § 82,] . . . [a testifying expert witness] must be a treating clinician" (emphasis added), advising them that she would "not be taking expert testimony from any witness who ha[d] never met the child[ren], seen the child[ren], evaluated the child[ren], assessed the child[ren], or treated the child[ren]."  Later, the judge characterized the treating relationship of a testifying expert as a "statutory requirement[]" and a "statutory mandate," and repeated that she would adhere strictly to the statute's requirement that only treaters could provide expert testimony about the children's reliability and availability.  The judge made other, similar rulings during the hearing, as we discuss infra, in rejecting the mother's proffer of expert testimony.

During the hearing, the department was permitted to call nine testifying witnesses, including laypeople to whom the children had disclosed being sexually abused,[13] and two experts, Dr. Forkey and Milde, each of whom had personally examined or evaluated Iliana or Susan.  Although the mother sought to call two additional expert witnesses to testify on issues of Iliana's and Susan's availability and reliability, the judge declined to

---

[13] Those witnesses included the children's foster parents, Iliana's former foster mother, Iliana's therapists, and Susan's therapist and trauma evaluator.

allow the proffered witnesses to testify on the grounds that they did not have a relationship with either child.[14]  The judge precluded Dr. Eli Newberger, a physician and expert on child abuse, from testifying at the § 82 hearing to critique the department's experts' methodology because he had "never met, evaluated, treated or assessed the child[ren] as is required by the statute."[15]  Additionally, as to both Dr. Newberger and the mother's second expert, Dr. Caroline Clauss-Ehlers,[16] the judge determined that "neither witness could testify to the time, clarity or circumstances of the child's statements, or to the child's psychological functioning" as required by G. L. c. 233, § 82.[17]

---

[14] The judge noted that the proffered witnesses "have never seen the child . . . .  They've never talked to the child. . . . They've never evaluated the child.  They've never treated the child."

[15] This evidence would have gone to the issue of the children's availability.

[16] A practicing psychotherapist and associate professor at Rutgers University, Dr. Clauss-Ehlers was expected to testify to the effect of telenovelas on Iliana's reliability.

[17] Although the judge expressed well-founded reservations about the relevancy of Dr. Clauss-Ehlers's testimony in light of the limited evidence that Iliana had actually seen the telenovelas about which Dr. Clauss-Ehlers was offered to testify, the judge's findings are clear that, "[m]ost importantly" in her view, Dr. Clauss-Ehlers had never met or treated Iliana.

Ultimately, the judge determined that Iliana's and Susan's statements satisfied the requirements of § 82 for admission at trial; the judge deemed the children unavailable due to the traumatic effect testifying at trial would have on their psychological and emotional well-being, and concluded that their respective statements were reliable. The case then proceeded to a trial on the merits before the same judge; the judge's thorough written findings of fact and rulings of law regarding the admissibility and reliability of the children's statements that described the allegations of sexual abuse made by the children were admitted as the first trial exhibit. Although the mother proffered Dr. Clauss-Ehlers as a trial expert regarding "availability and reliability" of the children's hearsay statements, the judge declined to allow Dr. Clauss-Ehlers to so testify on the grounds that the witness did not "meet the statutory criteria to be allowed to testify to that [issue] because she never met the child"[18] and "the [child's] statements [were] in [evidence]." At the conclusion of the trial, the judge found the mother unfit to parent the children, and

---

[18] The judge informed the mother at the beginning of the trial that the § 82 findings were admitted as an exhibit, that the judge could rely on them at trial, and that "[n]othing prejudices the mother's case if [she's] allowed to have any of those witnesses [that testified at the § 82 hearing] come back [and testify at the trial] and [the mother could] further cross examine them."

terminated her parental rights; with respect to Susan only, the judge ordered posttermination and postadoption visitation of two visits per year.  The mother timely appealed.

2.  Discussion.  a.  Section 82 expert testimony.  We turn first to the mother's argument that the judge erred in not allowing her to present expert testimony at the § 82 hearing to challenge the department's evidence of the children's unavailability and reliability.  The mother contends that the judge misinterpreted G. L. c. 233, § 82, when she concluded that the statute limited the mother's expert witnesses to clinicians who had "treated" either or both of the children.  We agree that the judge's interpretation of the statute was incorrect.  "We review questions of statutory interpretation de novo."  Meikle v. Nurse, 474 Mass. 207, 209 (2016), quoting Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).

"Section 82 of c. 233 of the General Laws is one of a trio of statutes enacted by St. 1990, c. 339, creating exceptions to the hearsay rule for out-of-court statements of a child under

ten years of age describing sexual contact with the child."[19],[20]
Adoption of Olivette, 79 Mass. App. Ct. 141, 146 (2011).  See
G. L. c. 233, § 82 (a).  The proponent of a child's hearsay
statement of sexual abuse "bears the burden of showing the
necessity for admitting the out-of-court statement by
establishing the declarant's unavailability to testify during
the trial."  Commonwealth v. Colin C., 419 Mass. 54, 63 (1994)
(analyzing G. L. c. 233, § 81).  See Adoption of Quentin, 424
Mass. 882, 892 (1997) ("The requirements outlined in § 82 are
analogous to § 81").  The statement "shall be admissible"
provided "that [it] is offered as evidence of a material fact
and is more probative on the point for which it is offered than
any other evidence which the proponent can procure through
reasonable efforts."  G. L. c. 233, § 82 (a).

---

[19] Section 81 of G. L. c. 233 governs the admission of
hearsay statements of child victims in criminal matters; G. L.
c. 233, § 83, governs the admission of such statements in foster
care and care and protection proceedings.  See Adoption of Tina,
45 Mass. App. Ct. 727, 732-734 (1998) (findings concerning
admissibility of child's hearsay statements should comply with
stricter requirements of statute governing admissibility of
hearsay in proceedings to dispense with parental consent to
adoption).

[20] Although Iliana was twelve years old at the time of the
§ 82 hearing and trial at issue here, both Iliana and Susan were
under the age of ten when they made their respective sexual
abuse disclosures.  See Adoption of Daisy, 460 Mass. 72, 77
(2011) ("out-of-court statements of a child under the age of
ten" means statements made by child "before they were ten years
of age" describing their sexual abuse).

In order to have admitted the children's statements in this case regarding occurrences of sexual abuse by the father, the department (as the proponent) had the burden first to demonstrate that the children were "unavailab[le]" as witnesses at trial.  G. L. c. 233, § 82 (b).[21]  "A finding of unavailability shall be supported by specific findings on the record, describing facts with particularity, demonstrating that

_____

[21] General Laws c. 233, § 82 (b), provides:

"The proponent of [an out-of-court] statement [of a child under the age of ten describing any act of sexual contact performed on or with the child] shall demonstrate a diligent and good faith effort to produce the child and shall bear the burden of showing unavailability.  A finding of unavailability shall be supported by specific findings on the record, describing facts with particularity, demonstrating that:

"(1) the child is unable to be present or to testify because of death or existing physical or mental illness or infirmity; or

"(2) by a ruling of the court, the child is exempt on the ground of privilege from testifying concerning the subject matter of such statement; or

"(3) the child testifies to a lack of memory of the subject matter of such statement; or

"(4) the child is absent from the hearing and the proponent of such statement has been unable to procure the attendance of the child by process or by other reasonable means; or

"(5) the court finds, based upon expert testimony from a treating psychiatrist, psychologist, or clinician, that testifying would be likely to cause severe psychological or emotional trauma to the child; or

"(6) the child is not competent to testify."

[as relevant here]: . . . (5) the court finds, <u>based upon</u> <u>expert testimony from a treating psychiatrist, psychologist, or</u> <u>clinician, that testifying would be likely to cause severe</u> <u>psychological or emotional trauma to the child</u>" (emphasis added). G. L. c. 233, § 82 (<u>b</u>) (5). The department called as witnesses two of the children's treating clinicians whom the judge qualified as experts; the judge relied upon this evidence, as she was permitted to do. See G. L. c. 233, § 82 (<u>c</u>).

Although § 82 (<u>b</u>) (5) requires expert testimony from a treating clinician in order to <u>establish</u> a child's unavailability based on the traumatic effect of the child being required to testify, nothing in § 82 limits a party <u>challenging</u> a child witness's claim of unavailability to evidence presented through a "treating psychiatrist, psychologist, or clinician," nor does it require that the opposing expert have any relationship with the child. G. L. c. 233, § 82 (<u>b</u>) (5), (<u>c</u>) (i). See <u>Adoption of Daisy</u>, 460 Mass. 72, 77 (2011) ("We do not read into the statute a provision which the Legislature did not see fit to put there, nor add words that the Legislature had an option to, but chose not to include" [quotation omitted]). While a judge could certainly consider the existence and nature of any relationship between the child and an opposing expert in assessing the weight of the opposing expert's testimony, see <u>Adoption of Olivette</u>, 79 Mass. App. Ct. at 150 (deference

accorded to judge's assessment of weight of evidence at § 82
hearing), those factors were not statutory disqualifiers for the
mother's proffered experts.[22]  See G. L. c. 233, § 82 (b) (5),
(c) (i).  In ruling that they were, and on that basis precluding
the mother from calling her expert witnesses, the judge
misinterpreted the statute, which was an error of law.[23]  See
Adoption of Ilona, 459 Mass. 53, 59 (2011) (termination of
parental rights reviewed for clear error of law or abuse of
discretion).

Although the department's evidence as to unavailability and
reliability of each child was strong, we cannot conclude that
the mother's expert testimony, if credited, would have been

_____

[22] At the oral argument in this case, the department agreed
to this application of the statute, but argued that the judge
did not rely on this interpretation of the statute in excluding
the testimony of the mother's experts.  We disagree, given the
judge's express statement in footnote one of her § 82 findings,
that the testimony must be excluded because the mother's "expert
[had] never met, treated, evaluated or assessed the child as is
required by the statute."  It is clear that the overriding basis
for precluding the mother's experts was the judge's erroneous
belief that the statute required her to do so.  We emphasize,
however, that the judge retained the discretion to exclude the
testimony on other, case-specific grounds, including relevance.
See, e.g., Palandjian v. Foster, 446 Mass. 100, 104 (2006) ("The
decision to exclude expert testimony rests in the broad
discretion of the judge").

[23] To the extent that the judge's rulings on this point
raise due process concerns, we need not, and do not, address
them.

ineffective in challenging it;[24] the error in excluding that evidence was therefore prejudicial.

The judge's findings and rulings of law on the admissibility of the children's hearsay statements describing allegations of sexual abuse were admitted at trial, over the mother's objection, and the judge relied on them in finding the mother unfit and terminating her parental rights.  The children's hearsay statements were the only evidence identifying the father as their sexual abuser; without that evidence, the judge's finding of the mother's unfitness was not sufficiently supported.  Because the judge's conclusion that the mother cannot adequately protect the children from the father is based on errors of law, the decrees must be vacated.[25]  See Adoption of Yale, 65 Mass. App. Ct. 236, 240 (2005) (vacating decree terminating parental rights where findings did not support conclusion that mother was unfit).

---

[24] The mother made offers of proof that (1) she could present evidence that Iliana watched telenovelas before her reports of abuse were made; (2) Dr. Clauss-Ehlers would testify that those telenovelas influenced Iliana, affecting the reliability of her reports; and (3) Dr. Newberger would testify concerning Iliana's availability.

[25] This was not the only basis on which the judge relied in terminating the mother's parental rights, but the children's hearsay testimony was a factor in most, if not all, of the other bases on which the judge relied.

b.  Alleged bias.[26]  Although our conclusion that the children's hearsay statements were improperly admitted requires that we vacate the decrees in this case, it does not bar relitigation of the mother's parental rights.  See Adoption of Jacqui, 80 Mass. App. Ct. 713, 719 (2011) (father granted new trial on termination of parental rights based on violation of due process rights).  As a practical matter, the mother's challenges to the permissibility of having the same judge preside over both the § 82 hearing and any subsequent trial are likely to arise in any later proceedings in this case; accordingly, we take the opportunity to address them.  See Kitras v. Aquinnah, 64 Mass. App. Ct. 285, 296 (2005) (because of remand, "joinder issue is likely to arise again").

---

[26] The mother's arguments on appeal that she was denied a fair trial because the judge's impartiality must necessarily have been compromised by the judge's having presided over the § 82 hearing that preceded the trial, or by the judge's personal bias, were not preserved below.  We generally do not consider a claim of bias raised for the first time on appeal.  "A party having knowledge of facts possibly indicating bias or prejudice on the part of an arbitrator, referee, juror or other person having similar functions cannot remain silent and thereafter on that ground successfully object to the decision" (quotation and citations omitted).  Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 534-535 (2014).  Although the argument is waived, see Adoption of Willow, 433 Mass. 636, 651 (2001); Adoption of Mary, 414 Mass. 705, 712 (1993), the particular facts of this case persuade us to consider it.  See Adoption of Norbert, 83 Mass. App. Ct. 542, 545 (2013) ("given the serious nature of the case, coupled with the fact that due process governs these proceedings, we believe that it is appropriate to consider the issue").

We are not persuaded by the mother's arguments.  We are aware of no authority that imposes an automatic or general prohibition against the same judge's presiding over both a § 82 hearing and the trial of the same case -- indeed, the mother concedes that no such authority exists -- and we decline to create such a rule.  In doing so, we would be invading unnecessarily into the province of the trial court's administration and imposing an unreasonable and impractical burden on it.

The trial judge is presumed to be a neutral arbiter in any matter before him or her, regardless of whether the judge has previously been involved with the parties, the issues, or the case.  See Jenkins v. Chief Justice of the Dist. Court Dep't, 416 Mass. 221, 244 n.40 (1993) (use of term "judicial" "connotes the neutral nature of the official making the probable cause determination").  The strict ethical constraints to which judges are subject not only require a judge to examine his or her own conscience for disqualifying bias, and to act accordingly, but also obligate the judge to recuse himself or herself from any matter in which "the judge's impartiality might reasonably be questioned."  S.J.C. Rule 3:09, Code of Judicial Conduct, Canon 2, Rule 2.11 (A) (1) (2016)  ("A judge shall disqualify himself or herself in a proceeding in which the judge cannot be impartial or the judge's impartiality might reasonably be

questioned, including but not limited to [instances where] . . . [t]he judge has a personal bias or prejudice concerning a party . . .").  See Lena v. Commonwealth, 369 Mass. 571, 575 (1976) (citing prior version of relevant section of Code of Judicial Conduct).  We decline to superimpose on the statute a requirement, not present there, that a judge's conduct of a hearing pursuant to G. L. c. 233, § 82, necessarily disqualifies the judge from presiding over the trial of the case to which that hearing relates.

With regard to the mother's concerns about the judge who conducted the § 82 hearing and trial in this challenging case, we are likewise unpersuaded.  The mother explicitly concedes that there is no evidence of bias in the judge's findings based on the § 82 hearing in this case, but points to a single excerpt from the record as evidence that the judge was "predisposed to rule against Mother, based on . . . the testimony she heard during the § 82 hearing."  We perceive no suggestion of bias in the passage to which the mother directs us.[27]  See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 524-525 (1997), quoting Haddad v. Gonzales, 410 Mass. 855, 863 (1991) (judge's

---

[27] We read that passage to be the judge's effort to contrast for the mother the risks and benefits of trial as a way of highlighting the value of the available mediation services.  Far from expressing bias, the judge acknowledged the mother's interest in going to trial and her right to do so.

impressions may properly carry over from one proceeding to another provided they were "acquired . . . in [her] judicial role and not from an extrajudicial source").  See also <u>Demoulas</u>, <u>supra</u> at 525, quoting <u>Liteky</u> v. <u>United States</u>, 510 U.S. 540, 551 (1994) ("opinions held by [a judge] as a result of what [the judge] learned in earlier proceedings" are not properly characterized as bias or prejudice).  The judge's comments during the § 82 hearing, including those highlighted in the mother's brief, emphasize the judge's appropriate concerns for the efficient litigation of the case and her interest in confirming that the mother understood the potential effects of the strategic choices that she made during the § 82 hearing and subsequent trial.[28]

   c.  <u>Hearsay beyond § 82 exception</u>.  The mother's final challenge on appeal is to the judge's admission at trial of certain hearsay statements by the children which did not describe sexual contact with them, and which were therefore not

---

[28] If the mother had any concerns about the judge's actual bias or "predisposition," those concerns could have been addressed through a motion to recuse the judge.  See <u>Adoption of Norbert</u>, 83 Mass. App. Ct. at 545-546 (deciding propriety of motion to recuse in context of judge's termination of parental rights).  As the mother did not bring such a motion, we infer that she was not concerned about the judge's bias until after a decision had been rendered.

subject to the hearsay exception created by G. L. c. 233, § 82.[29] The mother concedes, and we agree, that at trial, the statements at issue were supported by other, independently admissible evidence. To the extent that admission of any of the statements that the mother challenges on this ground was error, the error was harmless. See Adoption of Olivette, 79 Mass. App. Ct. at 156. As to the mother's argument that the admission of these statements raises "grave concerns about the Court's impartiality," for the reasons we have discussed supra, we are unpersuaded.

3. Conclusion. We vacate the decrees and remand for further proceedings in accordance with this opinion. The judge's findings, as they relate to the sexual abuse of the children, are struck.

So ordered.

---

[29] Such statements include, for example, the children's hopes for the outcome of the case, view of the father, and references to domestic violence between the mother and father and of physical abuse of the children; and Iliana's contact with a "coyote" (a man with whom the mother sent Iliana to Ecuador). See note 5, supra.